John P. Wagner et al. [1] v. Commissioner. Wagner v. Commissioner
Docket Nos. 50430-50433, 55923-55932, 56823, 56837, 56840.
United States Tax Court
T.C. Memo 1958-112; 1958 Tax Ct. Memo LEXIS 116; 17 T.C.M. (CCH) 569; T.C.M. (RIA) 58112; June 16, 1958
*116 Petitioner Transit Bus Sales, hereinafter referred to as Sales, was a corporation organized in 1937 and dissolved in 1950. The corporation was controlled by petitioners Edward M. Goemans and John P. Wagner. During the years 1937-1940, it was engaged in selling Ford, Aerocoach, and Pony Cruiser buses at retail. It also leased buses from time to time. 1. In 1942, a partnership under the name of Midwest Transportation Company was formed between Christine Goemans and Mazie Wagner, the wives of Goemans and Wagner, for the purpose of leasing buses. Held, that the partnership is entitled to recognition as a separate entity, and the income derived therefrom is taxable to the partners and not to Sales, Goemans, or Wagner. 2. In 1942, Mazie and Christine formed a partnership under the name of Transit Bus Parts to engage in the business of selling bus parts, purchasing the business formerly run by Sales. Held, that the partnership is entitled to recognition as a separate entity, and the income derived therefrom is taxable to the partners and not to Sales, Wagner, or Goemans. 3. In 1942, Goemans organized four corporations to engage in businesses dealing with aircraft, airports, and related services. *117 Each of the corporations became dormant soon after incorporation because of the war. Goemans, as president of each of the corporations, arranged for the purchase and resale of used buses by three of the four corporations. Held, the income derived from the transactions is taxable to the corporations which purchased and resold the used buses, and is not taxable to Sales under either section 45 or 129 of the Code of 1939. 4. In 1944, Goemans, Wagner, Christine, and Mazie formed a partnership under the name of Aerocoach Sales Company for the purpose, primarily, of selling Aerocoach buses at retail. The partnership purchased that part of the business formerly run by Sales. Held, on the facts, the partnership is entitled to recognition as a separate taxable entity, and the income derived therefrom is taxable to the partners and not to Sales, or to Goemans or Wagner, except for the interest of Goemans and Wagner in said income as partners. 5. In 1944, a partnership was formed by Agnes Roemer, Christine Goemans, Elizabeth Boynton, John Boynton, Frank Nolan, and Vera Nolan under the name of Transportation Equipment Sales. Agnes Roemer is a sister of Goemans. The Boyntons are relations of Wagner. *118 The partnership was formed to give the Nolans a share in the profits to be made by selling buses, furnished by Sales, to a Chicago transit system for which Frank Nolan's brother worked. Held, that the partnership is not entitled to recognition as a separate taxable entity, and the income attributed to it is taxable to Sales. 6. Goemans created four trusts, one for each of his children. The trustees were empowered to form a partnership to pool the resources of the trusts. They formed Mansgo Company, a partnership. In 1944, Mansgo, Mazie, Wagner, and Agnes Roemer, formed a partnership under the name of Transit Bus Sales Company to engage in the sale of Ford buses at retail. In 1946, a new partnership was formed under the same name, with only Mazie, Wagner, and Mansgo as partners. Both partnerships operated under a dealer franchise agreement with Sales, which, during the existence of the partnerships, acted only as a distributor of Ford buses. Held, that each of the partnerships is entitled to recognition as a separate entity, and Mazie and Wagner are taxable on their respective interests therein as partners. Held, further, the income attributed to Mansgo Company is taxable to Goemans, *119 who retained control over the income of the four trusts which formed Mansgo. 7. Held, that respondent erred in including in or consolidating with that of Sales the income of Midwest Transportation Company, Transit Bus Parts, Aerocoach Sales Company, and Transit Bus Sales Company #1 and #2 under section 45 of the Code of 1939. 8. Held, that the amount of $3,000 paid by Sales to Goemans for each of the years 1943, 1944, and 1945 to reimburse Goemans for travel and entertainment expense paid by him on behalf of Sales is deductible by Sales as ordinary and necessary business expense, and is not to be added to Goeman's net income for said years. 9. Reasonable compensation to Goemans and Wagner for services to Sales determined. 10. Held, that the sale of certain used buses by Aerocoach Sales Company and Transit Bus Sales Company resulted in ordinary income rather than capital gain. Held, further, that the sale of certain buses by Midwest Transportation Company and the sale of two automobiles, one each by Aerocoach Sales Company and Transit Bus Sales Company, resulted in capital gain. 11. Sales liquidated in 1950. At that time, it distributed its remaining assets to its stockholders - Mazie, *120 Wagner, and Goemans - in proportion to their stockholdings. Consents (Form 872) extending the time for assessment of income taxes against Sales were executed by the Commissioner and by Goemans, as president of Sales. Some of the consents were executed after the corporation had liquidated but before the three-year winding-up period provided for under Wisconsin law had elapsed. Held, Goemans, as president of Sales, had the power under Wisconsin law to act for the corporation; that the consents are valid; that the statutory notice of deficiency against Sales was timely; that the statutory notices issued against certain of the petitioners herein as transferees of Sales were timely; that none of the petitioners herein are liable as transferees of Sales except the stockholders who received liquidating distributions, and that the said stockholders are liable as transferees to the extent of the respective amounts received by them on liquidation of Sales, or the tax liability of Sales, whichever is the lesser. John S. Best, Esq., 110 East Wisconsin Avenue, Milwaukee, Wis., and Roy C. LaBudde, Esq., for the petitioners. John L. Pedrick, Esq., and John E. Owens, Esq., for the respondent. FISHER *121 Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies and overassessments in income, excess profits, and declared value excess profits taxes of the following petitioners in the amounts and for the years as set forth below: Transit Bus Sales - Docket No. 50433
Income Tax
Year
Deficiency
Overassessment
1941
$ 10,247.52
1942
2.49
1943
$ 1,130.30
1944
1,486.38
1945
215.36
Total
$ 10,465.37
$ 2,616.68
Declared Value Ex-
Excess Prof-
cess Profits Tax
its Tax
1941
$ 7,532.71
$ 19,489.14
1942
14,443.93
14,914.37
1943
42,899.52
1944
119,755.90
1945
40,455.12
220,027.36
Total
$ 62,431.76
$417,086.29
John Wagner - Income Tax
Docket No.
Docket No.
Year
50430
56823
1943
$ 9,964.87
1944
23,665.07
1945
31,365.98
1946
$ 10,218.22
1947
11,828.04
Total
$ 64,995.92
$ 22,046.26
Edward M. Goemans - Income Tax
50431
56840
1943
$ 18,103.65
1944
56,406.36
1945
147,887.46
1946
$ 88,720.18
1947
187,276.46
Total
$222,397.47
$275,996.64
Leo G. Roemer - Income Tax
50432
56837
1945
$ 2,350.07
1946
$ 180.06
Total
$ 2,350.07
$ 180.06
Petitioners in Docket Nos. 50433, 50430, 50431, and 50432 were each notified of the deficiencies as above set forth by statutory notices dated June 24, 1953. Petitioners in Docket Nos. 56840, 56823, and 56837 were each notified *122 of the deficiencies as set forth above by statutory notices dated December 22, 1954. Respondent, by statutory notices dated October 19, 1954, determined deficiencies for the years indicated against the following petitioners as transferees of the assets of Transit Bus Sales: Docket
Petitioner
No.
1941
1942
1943
1944
1. Grace Patricia
55923
$ 4,373.79
$1,750.58
$ 5,034.52
$15,749.19
Goemans Trust
2. Mazie F. Wagner
55924
11,025.18
4,412.77
12,690.72
39,699.56
3. Edward M.
55925
Transferee liability determined to
Goemans
$705be,476.76, equalling total of deficiencies
determined as to Transit Bus Sales.
4. Leo G. Roemer
55926
1,537.92
615.54
1,770.24
5,537.74
5. Agnes G. Roemer
55927
1,500.93
600.74
1,727.68
5,404.58
6. Christine
55928
7,782.91
3,115.07
8,958.65
28,024.77
Goemans
7. Margaret Eliz.
55929
4,373.79
1,750.59
5,034.52
15,749.19
Goemans Trust
8. John Walter
55930
4,373.79
1,750.58
5,034.52
15,749.19
Goemans Trust
9. John P. Wagner
55931.h17
7,106.93
20,438.87
63,937.63
124,205.82
,756.37
10. Jacqueline
55932
4,373.79
1,750.58
5,034.52
15,749.19
Gretchen Goemans
Trust
Petitioner
1945
1946
1947
Total
1. Grace Patricia
$ 30,594.50
$ 9,656.80
$15,632.68
$ 82,792.06
Goemans Trust
2. Mazie F. Wagner
77,120.75
24,342.26
39,405.90
208,697.14
3. Edward M.
Transferee liability determined to $705be,476.76,
Goemans
equalling total of deficiencies
determined as to Transit Bus Sales.
4. Leo G. Roemer
10,757.68
3,395.53
5,496.78
29,111.43
5. Agnes G. Roemer
10,498.98
3,313.88
5,364.60
28,411.39
6. Christine
54,441.16
17,183.72
27,817.47
147,323.78
Goemans
7. Margaret Eliz.
30,594.50
9,656.80
15,632.68
82,792.07
Goemans Trust
8. John Walter
30,594.50
9,656.80
15,632.68
82,792.06
Goemans Trust
9. John P. Wagner
39,204.11
63,464.66
336,114.39
10. Jacqueline
30,594.50
9,656.80
15,632.68
82,792.06
Gretchen Goemans
Trust
*123 The deficiencies as stated above with respect to transferee liability are predicated upon respondent's determination that the following assets of Transit Bus Sales were transferred to the persons named below in the amounts and in the years indicated: Petitioner
1943
1944
1945
1946
1947
1. Grace
$ 1,821.94
$ 18,559.05
$ 18,328.76
$ 44,082.31
Patricia Goemans
Trust
2. Mazie F.
$6,681.22
24,815.28
70,082.81
33,093.41
49,523.02
Wagner
3. Edward M.
9,854.21
79,536.82
199,600.02
142,898.26
218,092.04
Goemans
4. Leo G. Roemer
1,421.35
6,186.35
6,109.59
14,694.10
5. Agnes G.
1,421.35
6,186.35
6,109.59
14,694.10
Roemer
6. Christine
6,681.22
30,586.53
72,803.78
26,370.83
10,881.41
Goemans
7. Margaret
1,821.96
18,559.04
18,328.77
44,082.30
Eliz. Goemans
Trust
8. John Walter
1,821.94
18,559.05
18,328.76
44,082.31
Goemans Trust
9. John P.
4,535.87
29,821.19
93,604.59
58,511.63
97,838.25
Wagner
10. Jacqueline
1,821.94
18,559.05
18,328.77
44,082.30
Gretchen Goemans
Trust
Petitioner
1948
1949
1950
Total
1. Grace
$ 82,792.06
Patricia Goemans
Trust
2. Mazie F.
$24,501.40
208,697.14
Wagner
3. Edward M.
$5,000.00
77,004.40
731,986.75
Goemans
4. Leo G. Roemer
700.04
29,111.43
5. Agnes G.
28,411.39
Roemer
6. Christine
147,323.77
Goemans
7. Margaret
82,792.07
Eliz. Goemans
Trust
8. John Walter
82,792.06
Goemans Trust
9. John P.
51,802.96
336,114.49
Wagner
10. Jacqueline
82,792.06
Gretchen Goemans
Trust
*124 The issues involved are: (a) Whether or not the income of the various partnerships and corporations connected with petitioner, Transit Bus Sales, (as will be more fully set out infra), may be imputed to Transit Bus Sales under either or all of sections 22(a), 45, or 129, Code of 1939; (b) whether or not compensation paid to two of the officers of Transit Bus Sales during some or all of the years 1941-1947, inclusive, was reasonable; (c) whether or not $3,000 paid by Transit Bus Sales to one of its officers, Edward M. Goemans, in each of the years 1943, 1944, and 1945, constituted an ordinary and necessary expense, and was deductible as such under section 23(a), Code of 1939; (d) whether or not the said $3,000 payments are includible in the income of petitioner, Edward M. Goemans, in the years in which received; (e) whether the gain derived from the sale of certain used buses is taxable at ordinary income or capital gain rates; (f) whether or not various of the petitioners are liable as transferees of Transit Bus Sales, or as transferees of transferees of Transit Bus Sales; (g) whether, if the income of the various partnerships and corporations connected with Transit Bus Sales may not *125 be imputed to that corporation, it may be imputed to petitioners Edward M. Goemans, John P. Wagner, and Leo G. Roemer. Findings of Fact Some of the facts have been stipulated, and are found as stipulated and incorporated herein by this reference. Edward M. Goemans (hereinafter referred to as Goemans), petitioner in Docket Nos. 50431, 55925, and 56840, and Christine Goemans (hereinafter referred to as Christine, petitioner in Docket No. 55928, are husband and wife. John P. Wagner (hereinafter referred to as Wagner), petitioner in Docket Nos. 50430, and 55931, and 56823, and Mazie F. Wagner, (hereinafter referred to as Mazie), petitioner in Docket No. 55924 are husband and wife. Leo G. Roemer (hereinafter referred to as Roemer), petitioner in Docket Nos. 50432, 55926, and 56837, and Agnes G. Roemer, petitioner in Docket No. 55927, are husband and wife. Agnes G. Roemer is a sister of Goemans. During the taxable years here involved, the parties resided in Milwaukee, Wisconsin. The Grace Patricia Goemans Trust, the Margaret Elizabeth Goemans Trust, the John Walter Goemans Trust, and the Jacqueline Gretchen Goemans Trust, petitioners, respectively, in Docket Nos. 55923, 55929, 55930, and *126 55932, are trusts created by Goemans in November 1944, for the benefit, respectively, of his four children. Transit Bus Sales (hereinafter referred to as Sales), petitioner in Docket No. 50433, was a Wisconsin corporation organized in 1937 and dissolved in 1950. All tax returns of the petitioners for the taxable years here involved were filed with the collector of internal revenue for the district of Wisconsin. For many years, including the taxable years involved herein, Wagner was president of the Boynton Cab Company which operated the yellow cabs in Milwaukee, and which in 1937 operated a fleet of between 250 and 300 Ford cabs in Milwaukee. As a result of his position, Wagner had very close contact with the officials of Ford Motor Company who then used the Milwaukee operation "more or less as a laboratory for research in the cab business." The fleet of Boynton Cab Company was the largest fleet of Ford cabs in the United States and used Ford parts exclusively. In January or February 1937, Wagner talked to Simons, the Ford branch manager in Milwaukee, about the possibility of obtaining a franchise as a dealer in Ford transit buses. Wagner later went to Detroit to explore the possibilities *127 further in talks with officials of the Ford Motor Company. As a result of these conversations and Wagner's influence with the Ford Motor Company, Wagner was promised the franchise by Ford officials. He desired to obtain a partner in the enterprise "to do the bulk of the work," intending himself to stay in the background and merely retain contacts. Accordingly, he discussed with Richards the possibility of participating actively in the business, and took him to Detroit for final discussion with respect to the franchise. At Richards' suggestion, the job of running the "sales end" of this Ford bus dealership was offered to, and accepted by, Goemans, who had done legal work for Richards and had run an automobile finance company in Green Bay prior to 1937. On February 20, 1937, the parties formed Transit Bus Sales as a Wisconsin corporation with an initial authorized capital of $20,000, consisting of 200 shares of common stock at a par value of $100 per share. According to the Articles of Incorporation, the purpose of the corporation was, among other things: "(a) To engage in the business of buying, selling, leasing, manufacturing, repairing and operating automotive equipment and to carry *128 on a general sales and distributing agency for automotive equipment." Upon the organization of Sales, Goemans commenced working for the corporation in Milwaukee under a written employment contract. Sales issued 100 shares of its common stock to Wagner and Richards for cash ($2,000) and property (the franchise) paid in an amount valued at a total sum of $10,000. Wagner and Richards beneficially owned 50 shares each, but Goemans and T. M. Johnson each were given a qualifying share. The initial board of directors consisted of Richards, Goemans and Johnson, and its initial officers were Richards, president; Johnson, vice president; and Goemans, secretary-treasurer. On December 31, 1939, the board of directors of Sales authorized the issuance of additional stock of Sales in the amount of 25 shares each to Richards and Wagner, and 50 shares to Goemans. Richards and Wagner each paid the corporation par value for the additional shares, and Goemans paid par value plus an amount of $2,344.19 to equalize the then existing surplus. After the additional shares were issued, Sales had 200 shares outstanding of which Richards held 75, Wagner 75, and Goemans 50. One of Wagner's shares was a qualifying *129 share standing in Johnson's name. Richards left Sales in February of 1941, at which time Goemans was elected president and general manager of the corporation. Richards' stock was purchased in part by Goemans and in part by Mazie F. Wagner, so that thereafter Goemans held 89 shares, Wagner 74 shares, Mazie 35 shares and Christine and H. Peutz one qualifying share each. In December 1942, Sales, by amendment to its Articles, increased its authorized capital from 200 to 400 shares. The directors of Sales then sold Goemans an additional 20 shares for cash. Thereafter, and until the dissolution of Sales, Goemans owned 110 shares with one of his shares standing in the name of Christine; Mazie owned 35 shares; and Wagner owned 75 shares, with one of his shares standing in the name of L. G. Roemer (and others from time to time) as a qualifying share. Upon its organization, Sales became a dealer in Ford buses distributed directly by the Ford Motor Company. Ford Motor Company allotted Sales an initial territory within which it had the exclusive right to sell Ford buses, consisting of seven-eights of the State of Wisconsin. In February 1940, the State of Iowa, which had been served by a Ford bus *130 dealer at Des Moines, was assigned to Sales as an addition to its territory. Ford Motor Company, because it was dissatisfied with the manner in which its buses were being distributed and the manner in which most of the dealers were operating, decided to organize a national distributor for Ford buses. It therefore selected H. D. Fitzgerald, who was president of Union City Body Company, the company which built the bodies for Ford buses as well as for other companies, to set up a corporation to act as a national distributor. Accordingly, Transit Buses, Inc., (hereinafter referred to as Transit) was organized. Fitzgerald was elected president and Frank Geisler was elected vice president. Sales' dealership contract directly with the Ford Motor Company was terminated on February 19, 1941. Sales continued its business without interruption after termination of the contract until it acquired a new franchise from Transit on April 29, 1941. Under the written franchise agreement with Transit, Sales was alloted a territory consisting of seven-eighths of the State of Wisconsin, the northern one-half of Illinois, the northwestern one-eighth of Indiana, and all of the states of Iowa, Nebraska, Colorado, *131 New Mexico, Wyoming and Montana. In June of 1941, this territory was increased to include Minnesota, the northwestern one-eighth of Wisconsin, and the southern two-thirds of South Dakota. On December 12, 1941, the territory was further increased by Transit to include the Upper Peninsula of Michigan. These additions of territory represented the territories formerly allotted to dealers at Chicago, Omaha, Denver and Minneapolis. Besides outlining a new territory for Sales, the dealership agreement of April 29, 1941, provided, inter alia, that: 1. The agreement was to terminate and supersede the prior Ford Bus Dealer Sales Agreement; 2. Upon termination of the contracts, Transit had the right to repurchase buses from Sales at cost, with Sales to pay shipping; 3. Upon termination of the contract, Transit had the right to repurchase parts at Sales' cost less 10 per cent, Sales to pay shipping; 4. Sales was to "make service of buses" available to users of Ford buses in its territory. The service was to include" calls by competent service men" at regular intervals and at other times when necessary. Ford parts were required to be used in servicing. During 1937, Sales sold only Ford buses but *132 in 1938 it commenced selling the Gar Wood Buses manufactured in Algonquin, Michigan, by Gar Wood Industries. The Ford bus then handled by Sales was a 25-passenger unit which was the smallest transit or intracity bus made, excepting only a 21-passenger transit bus made by General Motors. The Gar Wood buses were larger and made for intercity use. The Ford bus was generally unsuitable for intercity use. Early in 1940, Gar Wood Industries discontinued the Gar Wood bus and sold its equipment and tools to General American Transportation Corporation. This corporation then organized General American Aerocoach Corporation which commenced building an intercity type bus known as the Aerocoach bus. One model of the Aerocoach bus could have been converted from an intercity bus to an intracity, transit bus, although for all practical purposes Aerocoach and Ford buses were not competitive. On February 27, 1940, Sales obtained a franchise from General American Aerocoach Corporation giving it the exclusive right to sell Aerocoach buses in Nebraska, Iowa, Upper Michigan, and the eastern seven-eighths of Wisconsin. No mention was made in the agreement as to the requirement that Sales not handle other *133 intercity buses or as to the assignability of the contract. General American Aerocoach knew that Sales sold Ford buses. In April and June of 1940, General American Aerocoach added to Sales' territory the State of Colorado, the balance of the State of Wisconsin, and the privilege of selling Aerocoaches to NorthlandGreyhound Lines of Minneapolis as its only customer in Minnesota. Later, Sales was authorized to sell Aerocoaches to Black Hills Transportation Company of Rapid City, South Dakota. On August 27, 1940, Sales obtained a franchise agreement from Kalamazoo Coaches, Inc., the manufacturer of the Pony Cruiser bus, under which Sales was given the exclusive right to sell the Pony Cruiser to bus operators in Wisconsin, Minnesota, Iowa, Nebraska, Illinois, Colorado, New Mexico, and Upper Michigan, except to three specified accounts located in the authorized territory. The Pony Cruiser franchise was obtained through the efforts of Goemans after consent to the handling of Pony Cruiser had been obtained by Sales from General American Aerocoach Company. Only a few sales of the Pony Cruiser were made by Sales and the line was dropped within one or two years from the date the franchise was *134 obtained. For the years 1940 through 1943, Sales sold Ford buses and Aerocoach buses as a duly licensed dealer in new automotive vehicles. Midwest Transportation Company In August of 1942, a number of Aerocoach buses were delivered to Sales for which buses Sales had no customer. At the time, Green Bay Stages, a bus line in Wisconsin, needed buses to haul workers to a shipbuilding company. Sales, acting through Goemans, leased the first three of the buses delivered to Green Bay Stages. Green Bay Stages needed additional buses. Instead of having Sales lease the additional buses, Goemans contacted his brother, Francis, who was then, through Goemans's efforts, in the employ of General American Aerocoach, and arranged to have Sales sell the remaining Aerocoach buses to Francis so that Francis in turn could lease them to Green Bay Stages. Thirteen buses in all were transferred by Sales to Francis, doing business as the Midwest Transportation Company (hereinafter sometimes referred to as old Midwest). The company had capital of $1,000 which was contributed by Goemans and deposited by him in a bank account for Francis. Francis paid no money down for the buses but gave his note for the entire *135 purchase price, secured by a chattel mortgage on 12 of the buses. Sales discounted the notes and transferred the chattel mortgage to the Marine National Exchange Bank in Milwaukee. One bus, a Ford intracity bus, could not be leased and was sold by Goemans shortly after old Midwest was formed. The profit from this sale was attributed to old Midwest. Old Midwest kept one of the newly acquired buses and used it in Burlington, Wisconsin, as a charter bus to haul draftees. Goemans arranged for Francis to go to Burlington with the bus, where he drove it and maintained it while being tutored by a bus operator in the operation and maintenance of buses. The business operated out of the premises of Transit Bus Sales in Milwaukee. Since Francis, for the most part, was located in Burlington learning the business and was, therefore, not available to sign checks for necessary disbursements, it was arranged that checks could be drawn on the account of old Midwest by any two of the following three individuals: Goemans, Francis, or A. M. Hoolihan. The books and records of old Midwest were also kept in Milwaukee, and were supervised by Goemans. All the buses acquired by old Midwest were obtained from *136 Sales. In the instant proceeding, respondent has not determined that Sales is taxable on the net income, or gross income and deductions, of Francis J. Goemans in his operation of old Midwest. Near the end of 1942, Goemans, after telling Francis that he (Francis) was not capable of running a bus operation, consulted Wagner about the formation of a new Midwest Transportation Company, a partnership to be composed of Mazie and Christine. Goemans told Mazie and Christine that taking over the business would be a good opportunity to make money, that the business was profitable and the outstanding leases were short term. Mazie and Christine agreed to the idea of forming a partnership. Accordingly, Goemans drew up the partnership agreement for new Midwest, which was executed on December 23, 1942. The purpose clause stated that the partnership was formed to own and operate the business of buying, selling, leasing and dealing in buses and transportation equipment "now owned by F. J. Goemans." Each partner was to furnish one-half of the capital, with profits and losses to be divided equally. Neither partner was to receive a salary. At the time of the formation of the partnership Mazie had assets *137 of $99,177.38, and Christine of $13,000. On the same day the partnership was formed, December 23, 1942, a sales agreement was entered into between Francis Goemans, on the one hand, and Mazie and Christine, on the other. The partners assumed the balance of old Midwest's obligation on the purchase price of buses transferred to it by Sales (which had been reduced to $58,390.62), and agreed to pay Francis $7,031.99, payable $300 per month from January 1, 1943, in exchange for the assets of old Midwest, among which were 12 buses, all but one of which were out on lease, and one of which was held for charter purposes. The amount of $7,031.99, considered by the parties as Francis's investment in the business, was arrived at by calculating the profit of old Midwest from the time Francis took over, and subtracting from that figure amounts previously with-drawn by Francis. The amount represented the net profit of old Midwest during the approximately 4 months of its operations. Goemans represented both parties to the sales agreement in the transactions and drew up all the instruments. Sales, by Goemans, president, consented in writing to the transfer of ownership of the buses described in the *138 chattel mortgage held by Sales, in consideration for which the partners agreed to execute and deliver to Sales a chattel mortgage on buses one and three to thirteen, inclusive. Ten days after the formation of the partnership, on January 2, 1943, Christine and Mazie each gave their individual note to Sales, each note in the amount of $29,195.31, and jointly executed the chattel mortgage agreed to. Monthly payments to Sales on the notes were made out of the earnings of new Midwest. By December 10, 1943, only $40,000 of the original $58,390.62 indebtedness remained unpaid and on that date Christine and Mazie, through Goemans as attorney in fact, borrowed $40,000 from and gave a note in that amount to, the Marine National Exchange Bank, secured by a chattel mortgage for 10 buses. The $40,000 was paid to Sales. At the time of creation of new Midwest, Mazie and Christine gave Goemans a power of attorney to act for them "in their name, place and stead to conduct the partnership business" and gave Goemans "full authority and power to do and perform any and all acts necessary" and also gave Goemans the power to delegate his authority. At the same time, Goemans delegated his authority to Leo *139 G. Roemer. The partners kept up with the business only through chance discussions entered into or overheard at social gatherings where the Wagners and Goemanses were both present. The two families met socially two or three times a week. Throughout the life of new Midwest, Goemans acted as its general manager. He handled all activities, did all the buying and selling, negotiated all leases, indirectly supervised the keeping of books and records, and carried on the operations of the business in general. All activities of the new Midwest were conducted from the same premises as those of Sales. For his services to the partnership, Goemans was paid a salary of $500 per month, which continued throughout the existence of the partnership. During the existence of new Midwest, Sales received only insignificant amounts of income from the leasing of buses. In August 1943, Midwest placed an ad in a trade journal in which it advertised a used bus for sale. In January, March, and April, 1944, Midwest placed ads in a trade journal in which it advertised a used bus for sale. The purchases, sales and leases of buses during the entire existence of new Midwest (January 1, 1943 to October 31, 1945), were *140 all negotiated by Goemans. In addition to his services in negotiating leases and collecting the rentals thereon for Midwest, Goemans in 1943 unsuccessfully negotiated on behalf of the partners thereof to buy the Milwaukee-Madison intercity bus operation. At its formation in 1942, the books and records of new Midwest showed Francis Goemans and Goemans as the only employees. Until he severed his relationship in August 1943, most of Francis's time was spent working for Transit Bus Parts, a partnership comprised of the same partners as Midwest, although occasionally he would deliver a bus to a customer for Midwest. His salary was at all times paid by Midwest. At various times, Midwest incurred direct liabilities (by giving its own notes) and indirect liabilities (by discounting the notes of others) to the Marine National Exchange Bank of Milwaukee, as follows: 1944
Direct
Indirect
June
$7,000
July
6,700
August
5,700
September
5,700
October
4,400
November
3,400
December
1945
January
$30,000
February
22,500
March
20,500
August
6,000
September
5,750 In addition, Midwest was directly liable to the bank on notes of $40,000, representing the remainder of the purchase price of the business, from December 1943. These notes *141 were paid in full by January 1945, out of earnings of the partnership. Withdrawals of the two partners in Midwest were paid by check drawn on the partnership account. These withdrawals were $10,000 by each of the partners in 1943; $11,875.68 each in 1944; and $15,000 each in 1945. Until sold, all of the buses owned by Midwest were leased to various bus operators, except for one bus used for charter purposes. By October 31, 1945, Midwest had sold all of its buses, and on that date ceased operations. Its assets, consisting of cash in the amount of $8,385, were distributed equally to Mazie and Christine on November 7, 1945. A schedule of the ultimate disposition of each bus owned by Midwest, along with the depreciation taken thereon before sale and the gain on sale is set forth below: Date
Lease
Depre-
Basis after
Acquired
Cost
Income
ciation
Depreciation
12/31/42
$ 9,113.81
$21,233.33
$ 6,562.83
$ 2,550.98
12/31/42
5,092.94
10,285.00
3,563.74
1,529.20
12/31/42
5,092.93
10,285.00
3,504.13
1,588.80
12/31/42
5,420.81
2,335.01
1,420.81
4,000.00
12/31/42
5,238.44
12,405.00
4,074.44
1,164.00
12/31/42
5,238.44
11,730.00
3,831.94
1,406.50
12/31/42
5,992.59
12,306.67
3,899.59
2,093.00
12/31/42
533.34
305.00
533.34
12/31/42
500.00
500.00
12/31/42
1,741.67
1,887.50
633.32
1,108.35
12/31/42
900.00
400.00
500.00
12/31/42
12,424.34
14,125.00
7,328.34
5,096.00
Totals
$57,289.31
$96,897.51
$35,219.14
$22,070.17
Bus Sold
3/3/43
*142 Profit
Profit on
Date Sold
Sold to
Selling Price
on Sale
Lease Income
7/26/45
Shinners Co.
$ 6,000.00
$ 3,449.02
$14,670.50
4/26/45
T.B.S. Co. *
4,916.52
3,387.32
6,721.26
4/14/45
Midland Coach
2,000.00
411.20
6,780.87
5/25/43
Midland Coach
4,000.00
914.20
8/25/45
Aerocoach Sales Co.
4,916.65
3,752.65
8,330.56
6/20/45
Aerocoach Sales Co.
5,186.16
3,779.66
7,898.06
5/23/45
T.B.S. Co. *
5,283.73
3,190.73
8,407.08
3/11/43
Marquette Univ.
1,650.00
1,116.66
305.00
3/25/43
The Auto Mart
800.00
300.00
8/21/43
Midland Coach
2,500.00
1,391.65
1,254.18
8/25/43
Motor Bus Co.
1,750.00
1,250.00
(400.00)
2/26/45
Green Bay Stages
5,500.00
404.00
6,796.66
Totals
$44,503.06
$22,432.89
$61,678.37
4/26/45
$ 2,941.71
Midwest at all times maintained its own books and records. It had its own bank account, checks, and stationery on which was its name and address. Midwest's books were clear and in good detail. Its officers were located in the same building as those of Sales. During the time Leo Roemer was connected with the bus business, he, with the help of Judy Cherti, who was not on the payroll of Midwest, directly supervised the keeping of the books and records. Thereafter, Judy Cherti kept the books. At the end of each year Goemans, for Sales, determined *143 the amount the partnership should pay for space occupied and services rendered on its behalf. In 1943, Sales charged Midwest $300 for office expense; in 1944, $200 was charged. These were the only charges made by Sales for space and services used by Midwest. Midwest Transportation Company was a valid partnership for income tax purposes, the income of which was taxable accordingly. Parts During the years 1937 through 1940, Sales operated as a dealer in Ford buses under a franchise from the Ford Motor Company. During this period, Sales did not handle Ford bus parts, but arranged for parts servicing through a Ford automobile dealer in Milwaukee, where customers of Sales could obtain parts. When, on April 29, 1941, Sales received from Transit Buses, Inc., a franchise to sell, inter alia, parts for Ford transit buses, Sales was required by the franchise agreement to handle parts and accessories and also to be properly equipped to render adequate service to users of Ford transit buses. In the agreement, Sales agreed that said service would include calls on owners at regular intervals and whenever necessary. Ford parts exclusively were to be used in servicing. The agreement also provided *144 that Transit, upon 60 days' notice of cancellation, could purchase all or any part of the parts inventory of Sales for its cost less 10 per cent. Sales was to bear all transportation charges, and to pack and ship the parts selected by Transit. Also, under the franchise agreement, Sales agreed to make convenient and competent authorized service available to users of Ford transit buses in its territory, provided such user was located closer to the place of business of Sales than the place of business of any other Ford transit bus dealer, or where, because of handling or transportation facilities, the user was more easily served by Sales than any other dealer. The franchise agreement was not assignable without written consent by Transit. There is no evidence that such consent was either requested or given. In May of 1941, shortly after the execution of the franchise agreement, Sales installed a parts department on its premises, including a stock of parts and a repair shop. Substantially all orders for parts were received by mail and shipped out. The parts business produced a profit of $193.66 after salaries of $2,876.94, on net sales of $24,651.34 for the period May 13 through December *145 31, 1941, and a profit of $900.74 after salaries of $4,373.97 on net sales of $62,829.56 for the full year 1942. On November 1, 1941, Sales employed Carl Suhrbier, who thereafter traveled the entire territory as a serviceman. He carried with him eight hundred to nine hundred pounds of parts and tools which were used by him for replacements made on the customers' premises. He made repairs and installed new parts. Suhrbier also called on operators who had recently purchased transit buses to give instructions as to maintenance and servicing. Parts deliveries were so made in states where Sales was not licensed to do business. Sales was advised by its attorney in November 1942 that one defense to a proposed suit by Sales for unlawful cancellation of a contract might be that Sales was a foreign corporation not licensed to do business in Michigan. On December 28, 1942, at Goemans' suggestion, a partnership was formed by Mazie and Christine under the name of Transit Bus Parts (hereinafter referred to as Parts). The agreement stated that the partnership was found "for the purpose of purchasing, owning and operating the business of buying, selling, leasing, and in all ways dealing in parts *146 accessories, tools and equipment now owned and operated by Transit Bus Sales * * *." Each of the partners was to furnish one-half of the capital, and profits and losses were to be shared equally. Goemans was present on the occasion of the formation of the partnership, and advised the partners that the business might not be very profitable. At the time the partnership was formed, Mazie and Christine executed a power of attorney which appointed Goemans their attorney in fact to conduct the business known as Transit Bus Parts. Goemans had had overall supervision of the parts department for Sales before the partnership was formed. After its formation, Bartell, who helped supervise the department, was put on Parts' payroll. The board of directors of Sales authorized the corporation to sell the assets of the parts department to Parts for a sum of not less than $20,000. The corporation's investment in the parts department was estimated at $17,750, (including parts, accessories, accounts receivable and cash) and profit for the year 1942 was estimated at about $3,000. On December 28, 1942, a sales agreement was entered into between Sales and Parts, by which Parts purchased the parts department *147 of Sales for its "reasonable inventory value" (the amount of which was unstated in the agreement). Sales agreed to accept Parts' note in payment of the assets, payable in installments of not less than $200 per month. It was also agreed that Parts would be permitted to continue business in the same premises used by the parts department of Sales, at a rental to be determined by the parties. Mazie and Christine contributed no cash capital to the partnership at its formation but did contribute $5,000 each on September 4, 1945. The consideration for the transfer of the parts department from Sales to Parts was reflected on the books of each as notes receivable and payable in the amount of $23,024.71. As disclosed by Sales' books, this amount was reduced to $15,000 by April 30, 1946, when the assets of Parts were sold at book value to Transit Bus Sales Company, a partnership. The books of Transit Bus Sales Company showed no notes payable at the end of its fiscal year April 30, 1947. Neither Mazie nor Christine performed any active services for the partnership. They kept up with the business only to the extent it was discussed when the Wagners and Goemanses met socially. On December 3, 1943, *148 almost one year after Parts had been organized, Transit certified to the State of Wisconsin that Sales was a duly authorized dealer in new Ford buses, and that Sales had adequate service facilities to meet factory requirements for servicing and reconditioning motor vehicles sold. From the time when it first started handling parts to December 31, 1942, Sales purchased the majority of parts and accessories from Transit, and resold them to operators at an average gross profit of about 32 per cent of retail price. After December 31, 1942, Sales continued to purchase most parts and accessories from Transit. Sales then sold the parts and accessories to Parts at cost and without profit. Goemans managed operations conducted by Parts and was paid a commission of 25 per cent of the gross profits. During World War II, he arranged to have parts unobtainable from Transit purchased from other sources, or manufactured by third parties. From the latter part of 1942 through April 30, 1946, bus parts were scarce. In November 1942, a month before the partnership was formed, the Office of Defense Transportation issued an order requiring purchasers of parts to obtain a certificate of necessity. Operators *149 could obtain a blanket certificate for all parts necessary to be purchased for their businesses. The success of Sales in selling new buses was due in part to the fact that Sales was able to furnish operators with service and parts. It was imperative for parts to be made available in order to sell buses. The handling of parts also provided Sales with valuable contacts among bus operators. During the existence of Parts, Carl Suhrbier was carried on the payroll of Transit Bus Sales and later, Transit Bus Sales Company, although he continued to carry bus parts on his trips, and he continued to supply and install such parts. "Bus Transportation" is a trade magazine with national circulation. It has a good reputation with bus operators and was subscribed to by many of them. From August 1944, until the dissolution of Parts, in April 1946, Sales advertised in "Bus Transportation" that it had bus parts available and that it serviced buses for Ford transit bus operators. The advertising continued after the dissolution of Parts and until July of 1946. Parts had its own shipping tags, and did its own billing with an Arco machine which imprinted the name of Parts on invoices. It had its own books *150 and records, which were clear and in good detail. Roemer directly supervised the books, and when he left the bus business the job was taken over by Judy Cherti. Neither of these persons was on Parts' payroll. Parts had its own bank account, checks, and stationery. It paid withholding and social security taxes. Parts was housed under the same roof as Sales. At the end of each year Goemans, for Sales, would decide how much Parts should pay for office charges and rents. In 1943 he charged Parts $300 for office expenses and $600 for rent. In 1944, he charged Parts $300 for office expenses and $1,200 for rent. In 1945, he charged Parts $650 for offices expenses and $1,200 for rent. In 1946, he charged $400Parts for rent through April 30, 1946. Parts made a profit in 1943 of $10,631.60 after salaries. In 1944, its profits was $18,705.82 after salaries, and in 1945 it was $31,860.70 after salaries. Parts incurred no direct or indirect bank liabilities. The partners made no withdrawals during the existence of the partnership, having been so advised by Goemans. As of April 30, 1946, the date the partnership dissolved, the assets and liabilities shown on the books of Parts were as follows: ASSETS
Cash
$ 9,221.20
Petty Cash
175.00
Part Inventory
30,496.63
Equipment
5,426.77
Accounts
Receivable
59,999.51
Total
$105,319.11
LIABILITIES
Notes Payable
$ 15,000
Accounts Payable
Partnership Accounts: Christine Goemans
$41,148.30
Mazie Wagner
41,148.30
$82,296.60
Other
8,022.51
$ 90,319.11
Total
$105,319.11
At *151 Goeman's suggestion, Mazie and Christine entered into a dissolution agreement whereby they agreed to dissolve Parts and authorized Goemans, as attorney in fact for Parts, to sell all the assets thereof at book value to Transit Bus Sales Company, a partnership. On the same day, Goemans, as attorney in fact for Parts, executed the necessary documents transferring the assets of Parts to Transit Bus Sales Company. The document states "For value received, we hereby sell and assign all the accounts receivable of Transit Bus Parts * * * to Transit Bus Sales Company." The partners in Parts did not receive cash at the time they transferred their assets to Transit Bus Sales Company. Their equities were reflected as accounts payable on the books of Transit Bus Sales Company in the amount of $41,148.30 each. The dates these accounts were paid, and the amount of each payment are as follows: Mazie
June 4, 1946
$27,237.61
November 2, 1946
13,910.69
Christine
June 4, 1946
$16,148.30
November 2, 1946
15,000.00
Four Corporations In December of 1942, Goemans and Wagner organized four Wisconsin corporations under the names of Victory Instrument School, Victory Air School, Wisconsin Hangar Co., and Aircraft Charter *152 Co. From the time of their organization until their dissolution in 1946, each company had 100 shares of stock of $100 par value issued and outstanding, of which Goemans and Wagner each owned 49 shares, and Christine and Leo Roemer one share each. Throughout the existence of these companies, Goemans was president and Christine was vice president of each; Roemer was secretary-treasurer of each until November 30, 1945. He was succeeded by J. E. Cherti on December 10, 1945. The same persons were directors of each, with Roemer being replaced by J. E. Cherti. Victory Instrument School and Victory Air School were organized principally to establish, operate and maintain schools for flight training and aeronautics. Wisconsin Hangar Co. was organized principally to conduct and operate hangars in airports. Aircraft Transportation Co. was organized principally to operate aerial passenger and baggage transportation service. Upon their organization, these corporations conduct aeronautical schools, purchased and leased aircraft to others, and considered the purchase of an airport. The cost of insurance on the school and aircraft leasing operations was prohibitive, and no insurance was carried. Hence, *153 four corporations were organized to minimize the risk. Each of the corporations became dormant a short time after they were organized, due to the war. Making use of idle funds of three of the four corporations, Goemans purchased used buses for them looking to a profit for them from the subsequent sale of the buses. A schedule of the disposition of the buses in question, all handled by Goemans, is set forth below: Sales
Date Acquired
Date Sold
Cost
Depreciation
Price
Description
Gain
8/27/45
4/4/46
$10,936.00
$1,218.00
$10,000
37-Passenger
$282.00
Victory Air
Aerocoach
School
8/27/45
4/4/46
10,936.00
1,218.00
10,000
37-Passenger
282.00
Wisconsin
Aerocoach
Hangar
8/27/45
4/4/46
10,936.00
1,218.00
10,000
37-Passenger
282.00
Victory
Aerocoach
Instrument
School Besides the foregoing, Victory Instrument School advertised two used buses for sale in December 1944. The record does not show their disposition. The Federal income tax returns filed by each of these four corporations for the calendar years 1944 and 1945 are in evidence as exhibits attached to the stipulation and marked Ex. 9-S to 9-Z, inclusive. Each of these returns shows that the corporation filing it reported gross income for each of said years and that in all cases, *154 with the exception of Wisconsin Hangar Co. for the year 1945, the gross income reported includes amounts not attributed to Sales by respondent. The returns of Victory Instrument School for 1945, Wisconsin Hangar Co. for 1944, Aircraft Charter Co. for 1945, and Victory Air School for 1944 and 1945 all showed reported gains on the disposition of airplanes. Victory Air School, Victory Instrument School, Wisconsin Hangar Co. and Aircraft Charter Co. at all times conducted their operations from the premises of Sales, without charge for rent or office expense. With the exception of Aircraft Charter Co. in 1944, none of these corporations ever paid salaries or other compensation. Three of the four aircraft corporations, Victory Air School, Victory Instrument School, and Wisconsin Hangar Co. were dissolved in April of 1946, and upon such dissolution the remaining assets of each of these three companies were distributed to the stockholders in accordance with their stock holdings. In March of 1946, Aircraft Charter Co. changed its name to Capitol Sales. During the existence of the corporations their books, which were clear and in good detail, were directly supervised by Roemer, and after he *155 left, by Judy Cherti. No charges were made for these services. The corporations had their own bank accounts, and their own stationery and checks. Said four corporations were valid entities for income tax purposes and none of the respective income of each is attributable to any other entity. Aerocoach Sales Company The franchise for the sale of Aerocoach buses which Sales received from General American Aerocoach Company in 1940, was for a period of one year with provision for extending the period for one or two additional years. Transit, the Ford distributor, knew that Sales was selling Aerocoach buses, but was not at first concerned. The contract between Sales and Transit did not prohibit such activity on the part of Sales. Geisler, as vice president of Transit in charge of sales, was interested only in the sale of Ford buses. He was constantly after the various dealers to cover their territory adequately and exploit all possibilities for sale of Ford buses. He demanded that dealers concentrate their efforts on Ford buses. Because of his interest in covering the territory for Ford, and because other dealers indicated a desire to carry more than one line of buses, he became more and *156 more concerned with Sales' activities relating to the sale of Aerocoach buses. Finally, Geisler specifically told Goemans to drop the Aerocoach line of buses. General American Aerocoach Company had no difficulty in disposing of the Aerocoach buses it manufactured. Indeed, there was often a considerable waiting period between the time a bus was ordered and the time it was delivered. However, no Aerocoach buses were manufactured during the period March 1943 to June 1944, because General American Aerocoach Company was engaged in war work during that time. Sales made no deliveries of Aerocoach buses from January 1 through April 15, 1944. Sometime prior to May 1, 1944, Fitzjohn, sales manager of General American Aerocoach Company, at Goemans's request, agreed to enter into a franchise agreement with a proposed partnership which was yet to be formed. Goemans thought that the formation of a partnership to deal in Aerocoaches would placate Geisler. Before agreeing to the new franchise, Fitzjohn required and received assurances that Goemans would continue to manage the sale of Aerocoach buses under the new franchise the same as he had under the old franchise. Fitzjohn took the view that the *157 new franchise agreement was, in effect, merely an extension of the prior franchise agreement the manufacturer had with Sales. Fitzjohn never at any time met or came in contact with any of the partners of the proposed partnership other than Goemans, although he did meet Christine socially from time to time. The Ford Motor Company did not know that Goemans was organizing a partnership to sell other makes of buses, although Geisler of Transit did know it. On May 1, 1944, Goemans, Christine, Wagner, and Mazie formed a partnership under the name of Aerocoach Sales Company. The Agreement stated that the partnership was formed "for the purpose of buying, selling, leasing and in all ways dealing in transportation equipment of any and all kinds, and specifically to obtain a distributorship or dealer contract for the distribution of buses and all forms of transportation equipment now or hereafter manufactured or sold by General American Aerocoach Company * * *." Each partner was to furnish his proportionate amount of capital and profits and losses were to be shared proportionately. Goemans and Christine each had a 33 1/3 per cent partnership interest and each contributed $333.33 to the capital *158 of the partnership. Wagner and Mazie each had a 16 2/3 per cent interest and each contributed $166.67 to the capital of the partnership. The term of the partnership was to be five years. No partner was to draw salary. On the same day, the partners gave Goemans a power of attorney appointing him their attorney in fact to conduct the business. At the same time Goemans delegated his authority to Roemer. On June 20, 1944, General American Aerocoach Company entered into a "Distributors Agreement" with Goemans as attorney in fact under which the partnership was given the franchise to sell Aerocoach buses in the territory consisting of Wisconsin, Iowa, Upper Michigan, Colorado, North Dakota, South Dakota, Wyoming and Minnesota (excepting the Greyhound Corporation account). The agreement was to run for three years and provided that the partnership would not sell "or in any way be associated with the sale of any inter-city type motor coach not made by the manufacturer." The franchise was nonassignable, and upon any change or dissolution in the partnership, or resignation or incapacity of a partner, the manufacturer required notification and no change was binding on it unless the manufacturer *159 was agreeable. On July 18, 1944, a little more than two months after the formation of the partnership, the State of Wisconsin Motor Vehicle Department issued Certificate of Registration No. 1578 which stated that Aerocoach Sales Company had been registered as a dealer in Aerocoach buses pursuant to sections 85.02 and 218.01, Wisconsin Statutes, for the calendar year 1944. In subsequent years, the Certificate of Registration was reissued by the Wisconsin Motor Vehicle Department to Aerocoach Sales Company as a dealer in Aerocoach buses. For the most part, Ford buses were sold in volume. Aerocoach buses, on the other hand, were generally sold one at a time. When an Aerocoach bus was sold, usually on terms calling for monthly payments, the purchaser would give a note and chattel mortgage to Aerocoach. These notes, secured by the mortgage, would be endorsed by Goemans as attorney in fact for Aerocoach and discounted as soon as possible with the Marine National Bank. Aerocoach would then pay the manufacturer. With but a few exceptions, buses were delivered directly to the operator from the factory. Occasionally, a customer would take delivery at the premises occupied by Sales and Aerocoach, *160 but Aerocoach did not carry in inventory of buses. The partnership was recognized, both by the manufacturer and customers, as a separate entity with Goemans as its manager. Aerocoach established a line of credit and borrowed from the American State Bank at Milwaukee. In addition, Aerocoach discounted all its customer paper with either the Marine National Exchange Bank of Milwaukee, or American State Bank. A schedule of the direct and indirect borrowings of Aerocoach is set forth below: Balance at
Direct
Indirect
end of Month
American
Marine
American
Total Indirect
1944 June
$ 30,300.00
$ 30,300.00
July
29,300.00
29,300.00
August
26,800.00
26,800.00
September
$ 9,840.00
25,300.00
35,140.00
October
19,270.00
23,800.00
43,070.00
November
18,450.00
22,300.00
40,750.00
December
27,470.00
22,300.00
49,770.00
1945 January
$30,000
26,240.00
22,080.00
48,320.00
February
30,000
44,210.00
32,150.00
76,360.00
March
30,000
42,180.00
91,342.90
133,522.90
April
40,150.00
86,632.90
126,782.90
May
38,120.00
82,922.90
121,042.90
June
36,090.00
76,347.90
112,437.90
July
80,000
34,060.00
109,579.76
143,639.76
August
52,950.00
102,219.76
155,169.76
September
25,000
70,540.00
99,459.76
169,999.76
October
68,030.00
93,949.76
161,979.76
November
50,000
93,787.60
87,939.76
181,727.36
December
76,207.60
82,429.76
158,637.36
*161 The following schedule shows the cash withdrawals made by the partners of Aerocoach: Dates
Christine
Goemans
Wagner
Mazie
5/31/45
$ 6,532.35
$ 6,532.35
$ 3,266.18
$ 3,266.17
8/25/45
10,333.33
10,333.33
5,166.67
5,166.67
10/ 4/45
5,000.00
5,000.00
2,500.00
2,500.00
10/ 2/46
5,000.00
2,500.00
2,500.00
10/21/46
5,000.00
3/ 3/47
5,000.00
5,000.00
2,500.00
2,500.00
4/24/47
10,000.00
10,000.00
5,000.00
5,000.00
5/23/47
10,000.00
10,000.00
5,000.00
5,000.00
6/19/47
20,000.00
20,000.00
10,000.00
10,000.00
4/30/48
12,399.24
12,399.24
6,199.62
6,199.62
Sales, in units and dollars of Aerocoach Sales Company for the years indicated were as follows: Year Ending
Units
Dollars
Ex.
4/30/45
41 *
$557,494.57
101
4/30/46
48
642,178.80
116
4/30/47
51
769,687.78
119
4/30/48
11
171,755.28
128
On October 23, 1946, Goemans as attorney in fact for Aerocoach, authorized any two of the following individuals to write checks, to endorse and guarantee notes, and do everything necessary to conduct the partnership's finances: Goemans, John L. Doyne, K. W. Feld, and J. E. Cherti. Doyne was a lawyer whom Goemans had employed to manage things for him. Doyne was on the payroll of Aerocoach for the *162 years 1947 and 1948, but neither Feld nor Cherti was on the payroll. During the calendar years 1944 (beginning May 1, 1944) and 1945, Aerocoach had no employees. In 1946 it had one. In 1947 it had two besides Doyne. In 1948, up to April 30, 1948, it had one. Besides dealing in buses, the partnership also acquired farm land, livestock, farm equipment, real estate, and a building. Respondent has conceded that the gain on the sale of the real estate is not taxable to Sales in any event but is taxable to those recited in the deed as owners, the same persons as the partners in Aerocoach. The following is a schedule of the disposition of three buses and an automobile acquired by Aerocoach on the dates indicated. The buses were held for sale to customers in the ordinary course of business. The car was used for company business but was not held for sale to customers. Date
Date
Acquired
Sold
Cost
Depreciation
Sales Price
Description
Gain
3/31/46
1/18/47
$ 983.33
$ 500 each
$1,650 each
3 - 1937
$200.01
each
yellow
coach
3,949.99
1,500
4,950
600.03
7/10/47
2,051.65
344
2,395
Company car
687.35
-
1947
Lincoln The agreement between Aerocoach and General American expired, by its terms, on June 20, 1947. On July 17, 1947, an agreement *163 entitled "Distributors Agreement" was executed between General American Aerocoach Company and Aerocoach Sales Corp., a Wisconsin corporation organized on June 22, 1946, with an initial authorized capital of $10,000, consisting of 2,000 shares of common stock of $5 par value. Upon its organization, Aerocoach Sales Corp. initially issued 1,002 shares of its stock for cash and property paid in, in the amount of $5,010. The shareholders in Aerocoach Sales Corp., the amount of their holdings, and the amount paid in by each are as follows: Name
Shares
Capital
Edward M. Goemans
750
$3,750
John P. Wagner
250
1,250
Christine Goemans
1
5
Judy E. Cherti
1
5
After the formation of Aerocoach Sales Corp., the corporation purchased Aerocoach buses from the manufacturer and resold them to Aerocoach Sales Company, the partnership, which resold them to bus operators. Respondent does not challenge the validity of Aerocoach Sales Corp., nor does he challenge its tax liability in this proceeding. The agreement between the manufacturer and Aerocoach Sales Corp. speaks in terms of renewing the three-year agreement of June 20, 1944, with Aerocoach Sales Company, the partnership. The corporation received a distributor's *164 license from the state, and the partnership a dealer's license. Aerocoach Sales Company, the partnership, was dissolved on April 30, 1948, under a written dissolution agreement. Upon such dissolution the partners divided the cash remaining, $37,197.72, in accordance with their percentage interests in partnership profits and capital. The success of the partnership was due to the efforts of Roemer and Goemans. At all times during the existence of Aerocoach, Goemans, as well as being a partner in Aerocoach, was an employee, officer, director, and stockholder of Sales. From May 1, 1944, to December 10, 1945, Leo Roemer was an employee, officer and director of Sales and held legal title to one share of stock in Sales. Thereafter, Roemer was not connected in any way with any of the corporations or partnerships involved in these proceedings. Aerocoach at all times had its own books and records, which were clear and in good order. They were supervised directly by Roemer before he left the bus business, and thereafter by Judy Cherti. The partnership had its own bank account, checks, and stationery. Aerocoach kept offices in the same building as Sales. For the year 1944, Goemans, for Sales, *165 charged Aerocoach $250 for office expense. For the year 1945, he charged the partnership $900 for office expense and $300 for rent. In 1946 the charges were $450 for rent through September 1946. The property in which the offices were located, 3859 N. Richards Street, were sold to Aerocoach at this time. Thereafter, they received $450 from Sales for the period July 1 to December 31, 1946, as rent on the Richards Street property, and as rent on property owned by Aerocoach at 400 East Capitol Drive, where the offices were finally moved. In 1947, Aerocoach received $175 from Sales as rent for the period January 1 to April 15, 1947. Thereafter, the East Capitol Street property was owned by Capitol Sales. The amounts paid by Sales to Aerocoach as rent were determined by Goemans. Aerocoach Sales Company was a valid partnership for income tax purposes, the income of which was taxable accordingly. Transportation Equipment Sales Early in 1944, Frank Geisler, vice president of Transit, requested that Goemans give Frank Nolan an interest in Sales. The background for the request was the fact that Frank's brother, Fred, who, as manager of a Detroit transit bus system had purchased many buses from *166 Geisler, had become manager of the Chicago Surface Lines, and could prove a valuable customer if something were done for his brother. Frank also was reputed to have contacts in Washington in connection with obtaining surplus property. Goemans refused to give Frank an interest in Sales, but after discussion with Geisler decided to form a partnership in which Frank Nolan and his wife would be made partners. On May 16, 1944, an organization known as Transportation Equipment Sales was formed. The ownership and interest of each partner and the amount contributed by each partner were as follows: Frank Nolan
16 2/3%
Note for $333.33
Vera H. Nolan
12 2/3%
Note for 333.33
Christine Goemans
30%
600.00
Agnes Roemer
10%
200.00
John P. Boynton
10%
200.00
Elizabeth D. Boynton
16 2/3%
333.33
Vera Nolan is the wife of Frank Nolan. Agnes Roemer is a sister of Goemans. John P. and Elizabeth D. Boynton are John P. Wagner's son and daughter-in-law. Christine Goemans is Goemans' wife. The partnership agreement provided for a term of five years, unless sooner terminated. Frank and Vera Nolan contributed only their notes as capital to the partnership. On the same date the partnership agreement was entered into, all of the *167 signatories to the agreement executed a written power of attorney to Goemans appointing him attorney in fact with full authority and power to conduct the business. At the same time, Goemans delegated this authority to Roemer, although Goemans acted as general manager of the partnership (sometimes referred to hereinafter as Equipment). Simultaneously with the formation of the partnership, an employment agreement was executed by the partners as employer and Goemans as employee which provided, among other things, that Goemans was to have full charge and management of the business; that Goemans was to receive one-tenth of the gross profits of the business, plus expenses; and that Goemans had an option to purchase one or more or all of the partnership interests at book value, which option he could exercise at any time during the existence of the partnership. There is no evidence of a formal agreement entered into between Sales and Equipment by which Sales granted Equipment the right to sell Ford transit buses in the Chicago territory. Following the formation of Equipment, Goemans and Frank Nolan made a trip to Washington on behalf of Equipment to investigate the possibility of buying surplus *168 material. On this trip Goemans took a draft in the amount of $70,000 issued by American State Bank to the order of Equipment in order to have cash with which to make a deal, should the occasion arise while in Washington. To obtain this draft the note of the partnership was given to the bank endorsed by Goemans. Nothing tangible resulted from the trip. As a result of negotiations handled entirely by Goemans, Chicago Motor Coach Co., Chicago, Illinois (not to be confused with Chicago Surface Lines, for which Fred Nolan was manager), placed an order for ten Ford transit buses with Equipment on June 15, 1944. At this time Goemans was president of, and a salesman for, Sales. Equipment purchased these buses from Sales and sold them to Chicago Motor Coach Co. This was the only transaction carried on in the name of Equipment. At no time did it sell any buses to Chicago Surface Lines, nor did it ever handle surplus property. As soon as Fred Nolan lost his position with Chicago Surface Lines, Goemans exercised his option in so far as the Nolans were concerned and immediately thereafter Equipment was dissolved. Each partner received his interest in cash. The Nolans were paid their share of the *169 net profit from the sale to Chicago Motor Coach Company, less the amount of their notes. The amount received by each was as follows: Goemans' purchase - 2/27/45
Frank Nolan
$1,721.60
Vera Nolan
1,721.60
E. D. Boynton
2,063.84
John P. Boynton
1,238.29
Christine
3,714.89
Agnes
1,238.29
Goemans
3,443.20
Equipment was not a valid partnership for income tax purposes. The income purporting to have been earned by Equipment is attributable for tax purposes to Sales. Four Trusts and Mansgo Company During the period 1940 through 1947, Goemans suffered frequently from neuritis. He was hospitalized six times, had one operation, and made over 10 trips to Mayo Clinic for check-ups and advice. Goemans's doctors advised him to move away from the cold, damp weather in Milwaukee and to ease the pressure of his business. Christine knew about these instructions and urged Goemans to follow them. Because of his poor health, and following the advice of Wagner and Christine, Goemans, as donor, on November 24, 1944, executed four separate trust agreements which designated the following persons as beneficiary and trustee, respectively: Age in
Initial Beneficiary
November 1944
Trustee
John Walter Goemans
10 years
Agnes Roemer
Grace Patricia Goemans
9 years
Mary Quigley
Margaret Elizabeth Goemans
4 years
Christine Goemans
Jacqueline Gretchen Goemans
5 months
Robert Quigley
*170 The four beneficiaries were Goemans' children. The trustees were related to Goemans in the following respective capacities: sister, sister, wife, brother-in-law. Each trustee was given the power to enter into a partnership for the purpose of investing the funds of the trust estate, and was allowed to invest the funds in business ventures, including those operated as partnerships. The trusts could employ others to manage such business. Each trustee was entitled to receive compensation for his services. The trust instruments were identical except for the names of the beneficiary and of the trustee. Each of the trusts was irrevocable and provided for the accumulation of net income during the minority of the beneficiary, except in certain emergency situations; and upon his majority all of the net income was distributable "at convenient intervals." The trusts also provided that when the initial beneficiary became 25, the trustee was to distribute one-third of the trust principal and accumulations, and when the beneficiary attained the age of 30, the trustee was to distribute one-half of the then remaining trust estate and accumulations, and upon his attaining the age of 35, all of the balance *171 was to be distributed; there were provisions for alternative distributions to persons other than Goemans or Christine, in the event the beneficiary died before 35. The only powers reserved in the trust instruments to Goemans as settlor were the power to contribute further assets to the trusts from time to time and the provision that in the event of a vacancy in the office of trustee, Goemans, if living (or Leo G. Roemer if Goemans were not living), had the power to appoint a successor trustee; except that if the initial beneficiary were then 21 years of age or over, he or she could make such appointment. On November 24, 1944, the day the trusts were executed, a partnership agreement was entered into by the four trustees as trustees of the trust described above. The name of the partnership was to be Mansgo Company, and it was organized for the purpose, as stated in the agreement, "of engaging in business of any and all kinds for the purpose of investing funds" of the respective trusts. Each partner had a 25 per cent interest in Mansgo Company. Also on the same day the four trustees appointed Goemans as their attorney in fact "to conduct the partnership business owned by them and operated *172 under the name of Mansgo Company." At the same time, Goemans delegated this authority to Roemer. Shortly after the trusts were set up, Goemans deposited $8,000 to the Mansgo Company bank account, purporting to represent a contribution of $2,000 to each of the trusts. The only bank account ever opened by or on behalf of the four trusts was the one opened on behalf of Mansgo Company at the Marine Bank. The only persons authorized to withdraw funds from this account were Goemans, Roemer - from December 19, 1944, to September 1946 - and Christine Goemans from and after September 1946. On September 30, 1946, K. W. Feld succeeded Agnes Roemer, Marie Quigley, and Robert Quigley and became trustee for each of the trusts, except the one for which Christine was trustee. Feld was an accountant who first became associated with various of the partnerships (Sales, Sales Company, Parts, Aerocoach, etc.) as the chief accounting officer of said companies. He was a vice president of Aerocoach Sales Corporation and was carried on the payroll of Capitol Sales, which was the successor to Aircraft Charter Co. Feld remained trustee of three of the trusts until September 27, 1949, at which time Christine *173 became trustee of all of the trusts. All of the trustees were furnished with copies of the trust indentures, balance sheets and monthly statements of the trust operation. During the time Feld was trustee he received no compensation as a trustee, nor did he open or maintain a bank account as trustee. His activities as trustee consisted solely of signing tax returns. The formation of Mansgo Company facilitated obtaining signatures and handling the investments of the trusts. Two of the trustees, Quigley and his wife, were not residents of Milwaukee. Each of the four trusts was a valid entity, but the income purportedly earned by each through Mansgo Company was income to Goemans for income tax purposes. Sales Company #1 and #2 The primary business of Sales was the sale of new buses. In 1943 and 1944, the territory of Sales was one of the largest of any dealer of Transit, and included the states of Colorado, Wyoming and Montana, and other mountainous areas. The Ford engine then used in the bus was not suitable for operation at high elevations. Geisler (as well as other officials of Transit and the Ford Motor Company) was aware of this fact and was aware that sales of Ford transit buses *174 were, up to June 1944, limited, for the most part, to operations in flat sections of the United States. During 1944, Goemans made 12 trips to Detroit, sometimes for three or four days at a time, meeting with Geisler, Fitzgerald, who was president of Transit, and Costello and Rabb, officials of Transit or Ford. At these meetings, plans for post-war changes in the Ford transit bus and its engine were discussed, and consideration was given to the possible manufacture of a post-war bus with higher torque and lower RPM's, to enable Fords to operate satisfactorily in hilly country. The discussion and consideration given to possible changes in the Ford bus were not intended to affect immediate design, but were intended to prepare the way for post-war changes. During 1944, Goemans realized the bus selling business was going to continue to be profitable in the near future. Goemans talked things over with Wagner and sometime prior to December 4, 1944, it was decided to set up a partnership to handle the business of selling Ford buses then being handled by Sales. It was contemplated that a dealership be set up, and that it be a partnership. Wagner suggested that Goemans should do something for *175 his children and for that reason Mansgo Company was made a member. On December 4, 1944, a meeting of the directors of Sales was held at which Goemans reported: (a) That on November 28 and 29, 1944, he had attended a meeting in Detroit of all Ford dealers under Transit, and that a more complete coverage of the territory was necessary; (b) That he would prefer to confine his time on behalf of the corporation to maintaining the contacts with the manufacturer, and acting as manager of Sales as a distributor rather than as a dealer, because he had become interested in the oil development business and would be unable to spend as much time in the bus business as heretofore; (c) That unless dealers were appointed to handle the retail sales, there was a very good possibility that the Ford bus distributorship contract might be cancelled; (d) That he was told at the meeting referred to above, that Transit intended to produce a small intercity bus sometime in the near future which would require very extensive sales work throughout the distributor's territory; (e) That because Sales was not licensed to do business in any state but Wisconsin, it was advisable to have the retail selling carried *176 on by dealers; and (f) That he had discussed the matter thoroughly with Wagner and Mazie, and that they agreed with Goemans that the best interests of the corporation necessitated confining the corporation to a distributorship business only, with retail sales to be handled by dealers. "As a result of that decision Mr. Goemans advised that he has arranged with Mr. Roemer to form a company to act as the retail dealer in Ford buses in the corporation's territory excluding therefrom the City of Chicago, which is now handled by a dealer appointed by this corporation." After the report was given by Goemans to the board, a resolution was adopted authorizing the corporation to enter into a dealership contract with a company to be organized by Roemer, or in the event a company was not so organized, with any one or more persons, firms, or corporations of which Goemans might approve. On December 6, 1944, a partnership was formed under the name of Transit Bus Sales Company (hereinafter referred to as Sales Company # 1). That partnership interests were: Wagner, 20 per cent; Mazie, 15 per cent; Mansgo Company, 60 per cent; and Agnes Roemer, 5 per cent. Each partner was to furnish his proportionate *177 amount of capital, and profits and losses were to be shared proportionately. No partner was to receive compensation for services. The business of the partnership, as stated in the agreement, was the "buying, selling, leasing, and in all ways dealing in transportation equipment of any or all kinds." A power of attorney was executed on the same day by all of the partners of Sales Company # 1 (Leo Roemer acting as attorney in fact for Mansgo), appointing Leo Roemer attorney in fact for the partnership. Roemer delegated his authority to J. E. Cherti on the same day. Before entering into the agreements described above, the plan was submitted to tax counsel for his opinion. The only doubt that was left at that time was the approval of such counsel. During 1943 and 1944, Roemer was traveling much of the time, to which his wife objected. It was primarily for that reason that she was allowed to buy into the Sales Company # 1 partnership, since it was felt that if she had an interest in the business for which her husband was working, she would be more content to let him spend time away from home. Goemans was present when Sales Company # 1 was organized. He advised the partners that Sales was *178 inserting a 30-day cancellation clause in its franchise agreement with Sales Company # 1 to allow removal of the Denver and Minneapolis territories should dealerships be set up in those areas. A 30-day cancellation cause was not out of line with termination clauses of similar contracts between unrelated parties and Sales. On December 6, 1944, an agreement was entered into between Goemans for Sales, and Roemer for Sales Company # 1, whereby Sales was referred to as distributor and Sales Company # 1 as dealer. The dealer was given the right to sell buses in Sales' territory (excepting the sale of buses to operators of the Chicago transit systems). The distributor agreed to sell to the dealer at the following prices: On 50 or less buses purchased during the calendar year, manufacturer's suggested retail price less 15 per cent; On 51 to 100 buses purchased during the calendar years, manufacturer's suggested retail price less 16 2/3 per cent; On purchases of over 100 purchased during the calendar year, manufacturer's suggested retail price less 18 per cent. The term of the agreement was contingent upon the continuance of the distributor's contract with Transit, and was to expire automatically *179 upon the termination of that contract. In addition, either party could cancel the contract on 30 days' notice. After Sales Company # 1 was organized, Carl Suhrbier was transferred to its payroll from Sales. Thereafter he continued to do the same work he had previously done for Sales. This continued until September 1947, at which time he went to California and associated himself with Goemans' activities there. Transit issued a Certificate of Appointment to the Wisconsin Motor Vehicle Department certifying that Sales was a distributor in Ford buses. Thereupon, the Wisconsin Motor Vehicle Department, on March 17, 1945, issued Certificate of Registration No. 12 to Sales, registering it as a distributor in accord with section 218.01 of the Wisconsin Statutes. On the same day, the Wisconsin Motor Vehicle Department issued Certificate No. 1800, which stated that Sales Company # 1 was registered as a dealer pursuant to sections 85.02 and 218.01, Wisconsin Statutes. On March 14, 1945, Goemans left on a trip to California and Arizona to survey that territory with reference to a bus dealership to be set up in California. On the same day, a meeting was held in Detroit between Transit and Ford *180 officials, at which time they discussed the contents of a letter from Geisler to Davis, Ford Sales' manager, orienting him with the present and future condition of the Ford bus business, and the requirements of the Ford post-war bus. The officials talked over in some detail the requirements of the post-war bus. The following day, March 15, 1945, Geisler suffered a severe stroke and thereafter was totally incapacitated. Goemans was not at this meeting. Goemans thought Geisler's illness made the future of Ford bus business doubtful. Later, in April 1945, at a meeting of Ford bus dealers in St. Louis, Missouri, which Goemans attended, Fitzgerald, president of Transit, announced that William Rabb was taking Geisler's place on a temporary basis. At this meeting the larger engine, the larger bus, and the possibility of making the Ford transit bus changeable into an intercity bus, were all discussed. On August 29, 1945, the New Mexico territory, which Goemans hoped would be added to Sales' territory, was given to Rabb, who also had the Dallas territory. In consideration for this transfer, it was agreed that Sales was to receive one-half of the net profit on all new Ford transit buses delivered *181 in New Mexico before January 1, 1947. Henry Jobes was connected with a Denver transit system. Geisler had indicated to him that Goemans might be intending to open new dealerships. Goemans made several trips to Denver after Sales Company # 1 was set up, and discussed at some length the possibility of Jobes setting up a parts depot for Ford buses in Denver. The cost of shipping parts from Milwaukee to cities in Sales' western territory was considerable and the idea to set up a parts depot met with the approval of at least one bus operator other than Jobes. At the same time serious discussion was held with respect to the opening of a dealership in Denver for the sale of Ford buses. Eventually, for the most part because of Geisler's heart attack, Jobes thought the idea for a bus dealership was dead. Goemans discussed with George Manson and C. W. Ahner the possibility of establishing Ford bus dealerships under Sales to cover the Minneapolis territory. Both men were experienced in bus operations. Each was reluctant to handle the dealership by himself, and refused Goemans's offer. Sometime during the first quarter of 1945, Wagner contacted S. J. Crowley of Chicago, and made arrangements for *182 Goemans to talk to him. Crowley was a financier whose activities consisted of dealing in stocks and bonds and acting as a glassbottle broker. Crowley was offered a dealership under Sales for the Illinois territory but refused. Pursuant to a verbal agreement made with Goemans on March 8, 1945, Crowley entered into an agreement with Sales Company # 1, which provided that Crowley was to engage in promotion work for the sale of Ford buses particularly with reference to the Chicago Surface Lines and Chicago and West Towns Railways accounts. For his services Crowley was to be paid $200 on each bus delivered to the Chicago Surface Lines and $100 on each bus delivered to Chicago and West Towns Railways, and $200 per month for office and sales expenses. Either party could cancel the agreement on 20 days' written notice. Crowley, with the aid of Wagner, sold at least 60 Ford transit buses to the Chicago Street Railways in Chicago, Illinois, on behalf of Sales Company # 1. The dealership contracts which Sales discussed with Jobes, Manson, Ahner and Crowley were to contain the same terms as the dealership contract between Sales and Sales Company # 1. In July of 1945, Roemer, who had been acting *183 as general manager of Sales Company, indicated that he was not satisfied with the future of the Ford bus and wished to leave the business. Goemans then talked with George Manson and Henry Jobes relative to one of them replacing Roemer. Both refused. Effective November 1, 1945, Sales Company # 1 engaged John L. Doyne as its general manager. On November 27, 1945, Leo G. Roemer, as attorney in fact for Sales Company # 1, delegated his authority to Goemans and on November 30, 1945, Roemer's activities with Sales terminated. He was paid $9,350 for the period he worked for Sales Company # 1, from December 7, 1944, until November 30, 1945. Upon the employment of Doyne, Goemans spent about five months working with him, and in April of 1946, Doyne began actively taking over the management. Thereafter, Goemans did nothing for Sales Company # 1 other than to help Doyne occasionally. Goemans received compensation from Sales Company # 1 in the years and amounts following: 1945, $12,814.42; 1946, $3,140.50. Under the date of March 19, 1946, Goemans, in care of Sales Company # 1, received a letter from W. C. Rabb, general manager of Transit, stating that the new bus would not be produced until the *184 fall of 1947, though the new chassis might be produced in the fall of 1946. Among the reasons stated for the delay was the fact that the labor situation had altered the post-war plans of most companies. On the basis of the information contained in Rabb's letter, Goemans decided to, and did begin consolidating the affairs of the bus business. Sales Company # 1 was dissolved, and Transit Bus Sales Company (hereinafter referred to as Sales Company # 2), a partnership comprised of Mansgo Company, Wagner, and Mazie, was formed. Pursuant to formal authorization from the partners of Parts, that partnership's assets were transferred to Sales Company # 2. As of April 30, 1946, the assets and liabilities per books of Sales Company # 1 were as follows: Assets
Cash
$ 5,290.40
Used Equipment
19,038.27
Accounts Receivable
55,634.90
$79,963.57
Liabilities
Accounts Payable
$79,963.57
Partnership Accounts
Mansgo Co.
$41,857.22
Agnes Roemer
3,488.10
John P. Wagner
13,952.41
M. F. Wagner
10,464.31
$69,762.04
Other
10,201.53
Total
$79,963.57
During the existence of Sales Company # 1 the following amounts were withdrawn by the partners: Mansgo Co.
$56,920.01
Agnes Roemer
4,474.34
John P. Wagner
18,973.34
Mazie Wagner
14,230.00
Sales Company *185 # 2 was formed, pursuant to a duly executed partnership agreement (Goemans as attorney in fact for Mansgo) for the purpose of buying, selling, leasing, and in all ways dealing in transportation equipment of any or all kinds. The interests of the partners were: Mansgo Company, 75 per cent; Wagner 12 1/2 per cent; and M. F. Wagner, 12 1/2 per cent. Each partner was to furnish a proportionate amount of the capital, and profits and losses were to be shared proportionately. No partner was to receive compensation for services. In fact, from the standpoint of activities, Sales Company # 2 was merely an extension of Sales Company # 1, with the addition of a parts department. There was also a change in partnership interests (Mansgo's was increased, Mazie's and Wagner's reduced, and Agnes's dropped entirely). On the same day the partnership was formed, a power of attorney was executed by Mansgo Company (by Goemans, attorney in fact) and by the other partners appointing Doyne as their attorney in fact to conduct the partnership business. At the same time Doyne delegated this authority to Judy E. Cherti. The assets and liabilities per books of Sales Company # 1, as of April 30, 1946, were transferred *186 to the books of Sales Company # 2, as of May 1, 1946. Upon dissolution of Sales Company # 1, the following balance in each partner's account was transferred to Sales Company # 2, and carried as an account payable: Mansgo
$41,857.22
Agnes
3,488.10
Wagner
13,952.41
Mazie
10,464.31
Agnes was not a partner in Sales Company # 2. Her balance, as indicated, was paid by the new partnership on May 15, 1946. The opening partnership accounts of Sales Company # 2 credited the partners with the following amounts: Mansgo
$56,250
Wagner
9,375
Mazie
9,375
The difference between the accounts payable to Mazie and Wagner and their partnership interests in Sales Company # 2 were paid to them by the partnership in cash on June 4, 1946. The increase in Mansgo's partnership interest over the account payable to it by Sales Company # 2 was paid in to the partnership by Mansgo on June 4, 1946. In October 1946, Doyne executed a form allowing any two of himself, Cherti, or K. W. Feld to write checks on the account of Sales Company # 2. K. W. Feld was on the payroll of Sales Company # 2 for only 49 days in 1946. Cherti kept the books for all the partnerships but was not paid by Sales Company # 2 for services to it. Doyne was *187 a full-time employee of Sales Company # 2. In 1946, Ford Motor Company notified Transit of cancellation of its contract to furnish Ford bus chassis and to permit Transit to sell Ford buses, to be effective October 1, 1947. Shortly thereafter Goemans was advised of this action. On August 1, 1947, Transit gave notice to Sales that as of October 1, 1947, its distributorship franchise covering Ford buses would be cancelled. Sometime after Transit received notice of cancellation of its Ford contract, it proceeded to produce its own 33-passenger bus. On August 18, 1947, Transit entered into a new franchise agreement with Sales, effective October 8, 1947, to sell this new bus in the same territory in which it formerly sold Ford buses. This franchise referred to Sales as "Dealer"; was in most respects identical to the previous franchise agreement and contemplated that Sales would sell buses, parts, and accessories directly to operators and would provide service facilities for said operators. Sales Company # 1 and # 2 incurred no direct bank liabilities. At various times during its existence, however, Sales Company # 1 incurred indirect liabilities as set forth in the following schedule: Indirect Liability Incurred by Transit Bus Sales Co. #1
Balance at End of Month
Marine
American
Total
1944 December
$ 8,640.00
$ 8,640.00
1945 January
$ 8,570.00
12,765.00
21,335.00
February
8,205.00
12,210.00
20,415.00
March
31,240.00
42,175.00
73,415.00
April
38,915.00
90,990.00
129,905.00
May
49,475.00
97,745.00
147,220.00
June
51,155.00
93,725.00
144,880.00
July
47,060.00
87,670.00
134,730.00
August
48,660.00
82,465.00
131,125.00
September
67,750.00
107,690.00
175,446.00
October
63,160.00
96,780.00
159,940.00
November
59,090.00
105,044.37
164,134.37
December
55,725.00
107,968.37
163,693.37
*188 Sales Company # 2 incurred no indirect liabilities. The indirect liabilities of Sales Company # 1 arose when it endorsed notes of bus operators over to Sales, which in turn would discount them with a bank, or when the partnership would itself sell the note to the bank. Some of the notes originally discounted with Sales and by it to the bank bore the personal endorsement of Wagner and Goemans as well as the corporate endorsement. From December 6, 1944, to April 30, 1946, the operations conducted by Sales Company # 1 - i.e., the sale of Ford transit buses and Ford transit bus chassis; and the servicing of Ford transit buses and Ford transit bus chassis - were the same as the functions performed by Sales prior to December 6, 1944. Likewise, the operation conducted by Sales Company # 2 were the same as those previously conducted by Sales. At all times the offices of both Sales Company # 1 and # 2 were located in and operated out of the same premises as those of Sales. In May 1944, before the formation of Sales Company # 1, Sales ran the following advertisement in Bus Transportation, a widely read and well received trade publication: "NEW BUSES FORD TRANSIT REAR ENGINE AEROCOACH MASTERCRAFT *189 INTERCITY "We are exclusive sales agents in Middle West and West. Some used buses available. "TRANSIT BUS SALES "1307 W. Atkinson Ave. Milwaukee 6, Wisconsin" From July 1944 until July 1945, in part during the existence of Parts and Sales Company # 1, the following advertisement, containing an obvious typographical error, was run by Sales in Bus Transportation: "NEW TRANSIT BUSES "Prompt deliveries of this most popular 27 passenger Ford rear engine bus continue to be made. "Our, at your garage, service and prompt delivery of parts will relieve you of many of the annoying details of present day bus operation. A great saving in manpower and parts can be made by replacing your old, heavy equipment at this time. "We also have used buses available at most times. "TRANSIT BUS SALES "1307 West Atkinson Avenue Milwaukee 6, Wisconsin
Phone: Concord 4440" From July 1945, until July 1946, in part during the existence of Parts, Sales Company # 1, and Sales Company # 2, Sales ran an advertisement in all respects the same as the above except that the words "Our, at your garage, service" were changed to read "Our service at your garage, * * *." In July 1946, during the existence of Sales Company *190 # 2, Sales ran the following advertisement: "FORD REAR ENGINE BUSES "The unit for profitable operation. Our prompt and efficient parts and maintenance service keeps them on the road. "TRANSIT BUS SALES, 400 East Capitol Drive, Milwaukee 12, Wisconsin, "Phone: Edgewood 3380" Neither Sales Company # 1 nor Sales Company # 2 advertised. Goemans took an active part in the activities of Sales Company # 1 only during the period from Roemer's departure and until Doyne could be broken in. He received no compensation from the partnership. Minutes of a special meeting of Sales, on March 11, 1948, state: "(a) That Goemans had concluded, after attending a meeting of Transit dealers, that the bus business in the future would fall off; "(b) That since Ford had cancelled the contract with Transit, it (Ford) had set up a separate distributorship organization; "(c) That in 1944 it looked as if Ford would manufacture an improved bus, and for this reason Sales was justified in setting up dealerships in Chicago, Minneapolis, Denver, and possibly one or two other locations; "(d) That Sales had granted one dealership to Transit Bus Sales Company; "(e) That the improved bus did not materalize and the necessity *191 for further dealers did not arise; "(f) That the projected future business did not justify having dealerships, and that the retail sales should be handled again by Sales, with Goemans again engaging in active retail bus sales work; "(g) That Goemans suggested that the dealership contract with Sales Company be terminated according to the 30-day clause, and that Sales should purchase the assets of Sales Company and take over whatever employees were required 'to again get into the retail bus sales, service and parts business.' "(h) That Goemans agreed to modify his employment contract to reduce his commission on the sale of other than new and demonstrator buses from one-third to one-fourth of the difference between the cost price and the selling price thereof, and that he should receive one-fourth of the gross profit of the corporation for all other transactions of the corporation. Goemans also agreed to change his expense remuneration for activity within the State of Wisconsin from a stated monthly expense account to actual expenses. "(i) That a resolution was passed to cancel the contract with Sales Company, to negotiate for the purchase of the assets of Sales Company, and to modify *192 Goemans's employment agreement as suggested at this meeting." The dealership contract referred to in the minutes of March 11, 1948, was the agreement entered into between Sales and Sales Company #1. Sales never entered into a formal dealership agreement with Sales Company #2, and never formally authorized the partnership to act as a dealer on its behalf. There is no evidence that Sales Company #2 ever registered as a dealer with the State of Wisconsin, or that it was ever recognized as a dealer by Transit, although Transit did recognize Sales Company #1. Sales Company #2 was dissolved, effective April 30, 1948, and its assets were transferred to Sales, as of May 1, 1948, at book value. The liabilities assumed by Sales were amounts owed Sales by Sales Company #2. During the existence of Sales Company #2, the following amounts were withdrawn by the partners: 1947
1948
Mansgo Company
$60,000
$90,000
Wagner
10,000
15,000
Mazie
10,000
15,000
Upon dissolution of Sales Company #2, the following final balance in each partner's account was transferred to Sales, and carried by Sales as an account payable: Mansgo Company
$194,437.24
Wagner
32,406.21
Mazie
32,406.21 Payment was made on the amounts so transferred *193 in each of the years 1948, 1949, and 1950, and the accounts were completely satisfied by the time Sales dissolved in 1950. Prior to December 6, 1944, Sales made an average gross profit of about $1,000 on each new Ford bus sold. Thereafter, and during the period Sales Company #1 and #2 were in existence, Sales reported a gross profit of about $400 on each bus sold. The remaining $600 gross profit was reported by Sales Company #1 and #2. Both Sales Company #1 and #2 had their own set of books, clear and in good detail, which were supervised directly by Roemer before he left the bus business, and thereafter by J. E. Cherti. The partnerships had their own bank accounts, checks, and stationery. Each had its own employees on which it paid social security and withholding taxes. The offices of the partnerships were at all times in the same building with those of Sales. At the end of each year Goemans, for Sales, would determine how much should be charged for rent and office expense. In 1945, he charged Sales Company #1 $1,200 for office expense and $400 for rent. In 1946, he charged the partnerships $850 for rent through September 30, 1946. Thereafter Sales did not own the building in which *194 the offices were located. The schedule set forth below reflects the sale of two buses and an automobile by Transit Bus Sales Company #2. The buses were held by the partnership for resale to customers. The automobile was used by Sales Company in its business and was not held for resale: Date Ac-
Date
Deprecia-
Sales
quired
Sold
Cost
tion
Price
Description
Gain
9/ 5/46
3/19/48
$1,200.00
$330
$2,000
Two Twin
$1,130.00
Coach Buses
7/16/47
2/24/48
2,065.56
301
2,385
Company Car
620.44
Sales Company #1 and Sales Company #2 were valid partnerships for income tax purposes. Their income is to be taxed accordingly, except that the amounts of income distributable to Mansgo, and through it to the four trusts, are taxable to Goemans. Statute of Limitations and Additional Facts re Transferee Liability During the years 1943 through 1945, Sales' direct obligations to the American State Bank were in various amounts up to $70,000 outstanding at one time, and its indirect liabilities to that bank ranged from a low of $11,000 to a high of $79,000. From May of 1941 through 1943, Sales' direct obligations to the Marine National Exchange Bank of Milwaukee were in various sums ranging from $43,750 in the month of June 1941, to a *195 high of $175,960 in February of 1942. Sales' indirect liabilities with Marine National Exchange Bank of Milwaukee ranged from a low of $3,200 in September of 1941, to a high of over $88,000 in December of 1944. Sales was directly or indirectly liable to at least one of the banks mentioned above at the close of every month from June 1941, to December 1945, inclusive. In large part, the indirect liabilities incurred after December 1944, represented notes which were transferred to it by Sales Company #1, and which it endorsed and discounted with the banks. A schedule of the net assets of Sales per books for the years 1937-1949, inclusive, and for the period January 1, 1950, to September 22, 1950, without reflecting additional liability for taxes as found herein, or interest accruing thereon, were as follows: 1937
$ 11,839.68
1938
13,808.85
1939
29,376.76
1940
32,181.96
1941
48,369.22
1942
62,798.86
1943
69,033.45
1944
79,554.54
1945
98,662.55
1946
138,518.21
1947
212,973.25
1948
159,289.82
1949
111,183.63
1950 to September 22
154,008.65 On September 22, 1950, all of the stockholders of Sales signed a written waiver of notice and consent to the holding of a stockholders' meeting on that day for the purpose of dissolving *196 the corporation. Pursuant to the waiver, a stockholders' meeting was held, at which Goemans, Wagner, Mazie, Christine, and Judy Cherti were present. At that meeting, a resolution of dissolution was adopted. A true and correct copy of this resolution was certified by Goemans and Judy Cherti as president and secretary of Sales, and duplicate originals of such certified resolution were filed in the office of the Secretary of State for the State of Wisconsin on September 25, 1950. One of the duplicate originals of said certificate so filed was returned to Sales and on September 27, 1950, was duly recorded in the Office of Register of Deeds, in and for Milwaukee County. On the date of dissolution, the outstanding capital stock of Sales consisted of 220 shares of the par value of $100 each standing in the name of the following persons: Edward M. Goemans
109 shares
Christine Goemans
1 share
J. E. Cherti
1 share
John P. Wagner
74 shares
Mazie F. Wagner
35 shares The share held in the name of Christine Goemans was beneficially owned by Edward M. Goemans, and the share held by J. E. Cherti was beneficially owned by John P. Wagner. Except for the above adjustments, those persons in whose name the stock *197 was listed were also its beneficial owners. As of the date of dissolution, September 27, 1950, the assets of Sales consisted solely of cash in the amount of $154,008.65, which was actually received on or about September 27, 1950, by Goemans, Wagner and Mazie, the beneficial owners of all of the stock of the corporation in the following amounts: Edward M. Goemans
$77,004.33
John P. Wagner
52,502.95
Mazie F. Wagner
24,501.37
At the time of the dissolution of Sales in September of 1950, Goemans, Christine, and J. E. Cherti constituted the board of directors of Sales and no directors were thereafter elected. Returns were filed by Sales at Milwaukee, Wisconsin, for all of the years 1941 through 1947, on March 15 of the next succeeding year, except that with respect to 1941, its return was filed on March 16, 1942. Sales filed a corporation income tax return (Form 1120) at Milwaukee, on October 2, 1950, for the period beginning January 1 and ended September 22, 1950. At the top of said return the words "Final Return" were typed in. On October 31, 1950, the collector of internal revenue at Milwaukee wrote a letter to Sales which stated in part: "A mathematical verification of the items on the Federal *198 income tax return filed by you for the period from January 1, 1950, to September 22, 1950, discloses errors which result in an increase of tax of $117.08. Your return has NOT been audited. IF, AS A RESULT OF A LATER INTENSIVE AUDIT IT DEVELOPS THAT ADDITIONAL INFORMATION IS NECESSARY OR FURTHER CORRECTIONS MUST BE MADE, YOU WILL BE DULY ADVISED." On March 15, 1951, Sales filed an amended return for the period January 1 through September 22, 1950, also marked "Final Return," by typing said words at the top of the return. The following persons were duly appointed by Sales as its attorneys to represent it in all matters respecting its Federal tax liability for the years indicated: 1941-1942, inclusive:
E. L. Fonteine, P. W.
McCurdy, George D.
Spohn
1943-1947, inclusive:
George D. Spohn At all times relative hereto, the same attorneys who represented Sales also represented all other petitioners herein. Under the terms of Forms 872, "Consent fixing period of limitation upon assessment of income and profits tax," which were signed on behalf of Sales and a representative of the Commissioner of Internal Revenue from time to time prior to September of 1950, the periods for assessment and collection *199 of additional income and profits tax for the taxable years 1941, 1942, 1943, 1944, 1945, and 1946, were properly extended through June 30, 1951. As to the taxable year 1947, no waiver was executed by anyone purporting to act on behalf of Sales prior to September 27, 1950, its date of dissolution. Of the 27 consent agreements executed prior to September 23, 1950, which duly extended the time for assessment of deficiencies against Sales for the taxable years 1941 to 1946, inclusive, to June 30, 1951, 25 were signed "Transit Bus Sales by Edward M. Goemans, President." The remaining two consents were signed "Transit Bus Sales by J. E. Cherti, Secretary-Treasurer." Petitioners agree that these consents are valid for all purposes. After September 30, 1950, the said duly authorized attorneys for Sales forwarded to the representative of the Commissioner of Internal Revenue the following Consent Agreements (Forms 872) purporting to extended the time for assessments against Sales for the years indicated: Taxable
Date of Exe-
Date of Ex-
Year
cution
piration
1941
3/28/51
6/30/52
3/20/52
6/30/53
1942
3/28/51
6/30/52
3/20/52
6/30/53
1943
3/28/51
6/30/52
3/20/52
6/30/53
1944
3/28/51
6/30/52
3/20/52
6/30/53
1945
3/28/51
6/30/52
3/20/52
6/30/53
1946
* 5/18/51
6/30/52
5/ 5/52
6/30/53
* 4/22/53
6/30/54
1947
* 1/29/51
6/30/52
5/ 5/52
6/30/53
* 4/22/53
6/30/54
Each *200 of the foregoing consents included the following language therein: "If a consent form is executed by a person acting in a fiduciary capacity, such as executor, administrator, or trustee, such person must submit Form 56, 'Notice of the Commissioner of Internal Revenue of Fiduciary Relationship,' together with a certified copy of letters of administration, letters testamentary, trust instruments, or court certificate. "If this consent is executed on behalf of a corporation, it shall be signed with the corporate name, followed by the signature and title of such officer or officers of the corporation as are empowered under the laws of the State in which the corporation is located to sign for the corporation, in addition to which the seal of the corporation must be affixed. Where the corporation has no seal, the consent must be accompanied by a certified copy of the resolution passed by the board of directors, giving the officer authority to sign the consent." Each of the foregoing consents was impressed with the seal of Sales and each was signed in the same way, viz: "TRANSIT BUS SALES By Edward M. Goemans, President," except those marked with an asterisk did not have the word "President" *201 following Goemans' signature. Each of the foregoing consents was duly signed by the respondent. Each consent extending the time for assessment was signed only by Goemans and by no one else. Each of the corporation income tax returns (Form 1120) filed by Sales for the taxable years or periods 1940 to 1947, inclusive, and 1949 to 1950, inclusive, was signed by "Edward M. Goemans, President" and one other officer. For the taxable year 1948, the Form 1120 filed by Sales was signed by J. E. Cherti, secretary-treasurer, and one other officer. Each of the corporation excess profits tax returns (Form 1121) filed by Sales for the taxable years 1941 to 1945 was signed by "Edward M. Goemans, President" and one other officer. By the terms of the last waivers signed on behalf of Sales prior to September 27, 1950, as stated before, the time for assessment expired June 30, 1951, as to additional income and excess profits taxes for the taxable years 1941 through 1946. On March 28, 1951, George D. Spohn, acting on behalf of all petitioners herein, wrote a letter to the Bureau of Internal Revenue, which stated in part: "Gentlemen: * * *
"We enclose Forms 872, executed in triplicate, extending the period *202 for assessment of the income of the following for the years indicated to June 30, 1952: Transit Bus Sales
1941 to 1945, incl.
Capitol Sales
1944 and 1945
Victory Air School
1944 and 1945
Victory Instrument School
1944 and 1945
Wisconsin Hangar Co.
1944 and 1945
Edward M. Goemans
1943, 1944, 1945
Jacqueline Gretchen Goe-
mans Trust
1945
Margaret Elizabeth Goe-
mans Trust
1945
John Walter Goemans
Trust
1945
Grace Patricia Goemans
Trust
1945
Mrs. Christine Goemans
1943, 1944, 1945
* * *
"P. S. The Roemer consents haven't as yet been returned to our office. G.D.S." On January 4, 1952, George D. Spohn, acting on behalf of all petitioners herein wrote a letter to a representative of the Bureau of Internal Revenue which stated in part: "We enclose Forms 872 signed by the following taxpayers covering the taxable year ended December 31, 1948, extending the period for assessment to June 30, 1952: Aerocoach Sales Corporation
Capitol Sales Transit Bus Sales Edward M. & Christine Goemans John Walter Goemans Trust Grace Patricia Goemans Trust Margaret Elizabeth Goemans Trust Jacqueline Gretchen Goemans Trust" On March 19, 1952, George D. Spohn, acting on behalf of all petitioners herein, wrote a letter to the Bureau of Internal *203 Revenue which stated in part: * * *
"We enclose Forms 872, executed in triplicate, extending to June 30, 1953, the period for assessment of the income of the following taxpayers for the taxable years indicated: John Walter Goemans
Trust
1945
Grace Patricia Goe-
mans Trust
1945
Margaret Elizabeth
Goemans Trust
1945
Jacqueline Gretchen
Goemans Trust
1945
Mrs. Christine Goemans
1943, 1944, 1945
Edward M. Goemans
1943, 1944, 1945
Transit Bus Sales
1941, 1942, 1943,
1944, 1945
Capitol Sales
1944, 1945
Victory Air School
1944, 1945
Victory Instrument
School
1944, 1945
Wisconsin Hangar Co.
1944, 1945
Mrs. Mazie F. Wagner
1943, 1944, 1945
John P. Wagner
1943, 1944, 1945
Elizabeth D. Boynton
1945
John P. Boynton
1945 "We will forward the consents of Mr. and Mrs. Roemer just as soon as we receive them." * * *
On or about April 18, 1954, George D. Spohn, acting on behalf of all petitioners herein, wrote a letter to the Bureau of Internal Revenue which stated in part: * * *
"This is to acknowledge receipt of your thirty-day letter addressed to the above named taxpayer and dated April 8, 1954, * * *. This letter has been referred to us. Powers of Attorney will be sent to you shortly, running to the undersigned. "We have requested an *204 additional thirty days within which to file a protest to the proposed assessment and over-assessment on behalf of the above named taxpayer. This is to confirm your telephone conversation with the undersigned whereby your office has granted our request for an extension of time, to expire June 8, 1954." On April 19, 1954, the director of internal revenue wrote to George D. Spohn as the duly authorized representative of all petitioners herein, which stated in part: * * *
"Receipt is acknowledged of your letters of April 14, 1954, referring to Revenue Agent's reports covering income tax liability for (years) 1946 through 1950 as shown in the preliminary (notices) mailed on April 8, 1954. "Pursuant to your request, an extension of 30 days is granted in which to file a protest to the proposed adjustment. "The extended time will expire on June 8, 1954." * * *
On June 10, 1954, the director of internal revenue wrote to George D. Spohn as the duly authorized representative of all petitioners herein, stating in part as follows: "Receipt is acknowledged of the protests dated June 3, 1954, which will be given proper consideration. "Since the period for making assessments on some of the returns will *205 expire on June 30, 1954, it will be necessary for you to have the enclosed waivers, Form 872, as listed below, executed if consideration of the protests are to be given by the Appellate Division. * * *
"[Here followed the names and addresses of Wagner, Mazie, individually and joint; Sales; the four trusts; Aerocoach; Goemans and Christine, individually and joint; Capitol Sales Company; Agnes Roemer, and Leo G. Roemer.] "If the waivers are not executed and returned to this office on or before June 18, 1954, it will be necessary to issue statutory notices of deficiency which will preclude a hearing before the appellate division on the protests." * * *
On June 11, 1954, George D. Spohn, acting on behalf of all petitioners herein, wrote a letter to the Bureau of Internal Revenue which stated in part: "We have your letter of June 10, 1954, in which you acknowledge receipt of protests dated June 3, 1954, which you state will be given proper consideration. You point out in your letter that since the period for making assessments on some of the returns will expire on June 30, 1954, it will be necessary for your Department to have waivers, Form 872, as listed in your letter, executed if consideration *206 of the protests is to be given by the Appellate Division. You enclose with your letter some 37 waivers, and you point out in your letter: "If the waivers are not executed and returned to this office on or before June 18, 1954, it will be necessary to issue statutory notices of deficiency which will preclude a hearing before the appellate division on the protests. "We represent all these taxpayers. Our powers of attorney are on file. We will do our best to forward these forms to these taxpayers, and we will recommend that they be signed and returned to us for delivery to you within the prescribed period. We do wish to point out, however, that, taking into consideration the length of time these Transit Bus Sales cases have been pending in your Department, the time limited by your letter of June 10 within which these waivers may be sent out to these taxpayers, many of whom live in varying parts of the country, and returned, is very brief indeed and is wholly unreasonable. "As pointed out above we will do our best to get these waivers back before June 18, 1954." On June 17, 1954, Roy C. LaBudde, an attorney of record in the instant cases, and a person who was duly authorized to represent *207 all petitioners herein, wrote a letter to the Internal Revenue Service which stated in part: "Under date of June 10, 1954, you sent to us certain waivers, Form 872, to be signed and returned to your office on or before June 18, 1954. Mr. Spohn replied to your letter of that date under date of June 11, 1954, stating that we should make every effort possible to get these waivers back to you before the date set. "We enclose the following waivers: [Agnes; Leo Roemer; Capitol Co.; Edward M. Goemans] "We are endeavoring to obtain the waivers requested in your letter on behalf of John P. Wagner, Mazie F. Wagner, and Mr. and Mrs. John P. Wagner; the four trusts of which Christine Goemans is trustee; the joint waiver by Mr. & Mrs. Edward M. Goemans for 1948 and 1949, and the individual waiver of Mrs. Christine Goemans for the years 1946 and 1947. These waivers, we are advised, are in the mail directed to us and we will have them in your office either Monday or Truesday of next week. "The waivers you sent us to be signed by Transit Bus Sales, a corporation, for the years 1946 through 1949, and for Aerocoach Sales Corporation for the years 1946 through 1949, cannot be signed. These corporations *208 were dissolved more than three years ago and the three years statutory period under Wisconsin law during which these corporations continue as entities in dissolution has now run. At present there is no one in existence who can act for these corporations or whose signature on a waiver would be binding and effective with respect to the tax liability of those corporations as such. Therefore, we cannot have signed and return to you the waivers requested on behalf of Transit Bus Sales, a corporation, and Aerocoach Sales Corp." * * *
On June 24, 1953, respondent issued a statutory notice of deficiency addressed to Sales, determining deficiencies for its taxable years 1941 through 1945. On June 30, 1954, respondent issued a notice of deficiency addressed to "Transit Bus Sales, c/o Edward M. Goemans," determining deficiencies for the taxable years 1946 and 1947 and an over-assessment for the period January 1 through September 22, 1950. On October 19, 1954, respondent issued 10 statutory notices of transferee liability to the 10 individuals named by respondent as transferees of Transit Bus Sales, with respect to the income and excess profits tax deficiencies of Sales for its taxable years 1941 *209 through 1947, and overassessments for the period January 1 through September 22, 1950. Following the notice issued by respondent on June 24, 1953, Sales, on September 4, 1953, filed its petition with this Court for redetermination of the deficiencies proposed as to the years 1941 through 1945, which proceeding was then assigned Docket No. 50433. Said petition was captioned and verified as follows: "TRANSIT BUS SALES, Petitioner, V. Docket No. 50433 COMMISSIONER OF INTERNAL REVENUE, Respondent. PETITION * * *
STATE OF WISCONSIN, MILWAUKEE COUNTY] SS. "Edward M. Goemans, being duly sworn, says that he is president of petitioner Transit Bus Sales; that Transit Bus Sales is a corporation, and he makes this verification for and in behalf of petitioner and is duly authorized so to do; that he has read the foregoing petition and is familiar with the statements contained therein, and that the statements contained therein are true, except those stated to be on information and belief, and those statements he believes to be true. (s) Edward M. Goemans / Edward M. Goemans, President "Subscribed and sworn to before me this 24 day of August, 1953. (s) Judy E. Cherti / Notary Public, Milwaukee County, *210 Wisconsin. My Commission expires: 10/17/54" [SEAL] In said petition, the petitioner, Sales, pleaded the defense of the statute of limitations for the years 1943, 1944, and 1945 only. This petition was signed by George D. Spohn, John D. Best, and William C. Brunsell as counsel for petitioner and was verified by Goemans as president of petitioner. In respondent's answer in Docket No. 50433, filed November 9, 1953, respondent affirmatively alleged: "(6) The respondent alleges affirmatively that the statute of limitations for assessment and collection has not expired with respect to the years 1943, 1944, and 1945 for the reason that consent agreements extending the time for assessment and collection to June 30, 1953 were duly executed by petitioner and the Commissioner and under the provisions of Section 276(b) of the Internal Revenue Code the issuance of the statutory notice of deficiency to petitioner was within the period provided by law." On December 23, 1953, petitioner in Docket No. 50433 filed a reply to respondent's answer which stated: "(6) Admits that consent agreements extending the time for assessment and collection to June 30, 1953, with respect to petitioner's taxable years *211 1943, 1944, and 1945, were duly executed by petitioner and the Commissioner under the provisions of Section 276(b) of the Internal Revenue Code. Denies all remaining allegations of fact contained in Paragraph (6) of respondent's answer, not hereinbefore admitted." On December 15, 1953, Goemans, Wagner, and Mazie filed a motion in Transit Bus Sales v. Commissioner, Docket No. 50433, as transferees of Transit Bus Sales, "a former corporation," asking that the moving parties be substituted as petitioners in said proceeding. A hearing was held before this Court on January 6, 1954, prior to which respondent had filed objections to the motion. On February 5, 1954, respondent filed a motion to dismiss the proceedings in Docket No. 50433 for lack of a necessary party. Under date of January 26, 1955, by order of the Honorable John W. Kern, then Chief Judge of this Court, petitioners' motion for substitution and respondent's motion to dismiss the proceedings in Docket No. 50433 were both denied. On the Court's own motion, the proceeding was consolidated with the "transferee cases," Docket Nos. 55923 through 55932. Following the statutory notice issued June 30, 1954, (proposing a deficiency as *212 to Sales' taxable years 1946 and 1947, and proposing an overassessment for the period January 1 through September 22, 1950) Goemans, Wagner, and Mazie, as "transferees of Transit Bus Sales, a former corporation," on September 23, 1954, filed a petition with this Court for redetermination of the deficiencies of Sales for its taxable years 1946 and 1947, which proceeding was assigned Docket No. 54860. On November 22, 1954, respondent filed a motion with this Court to dismiss the petition on the ground that the petitioners were not the taxpayer to whom the said notice of deficiency was issued, and were not the persons claiming to be empowered to act in its name. As an additional ground for the motion, respondent set forth that this Court lacked jurisdiction for the reason that the taxpayer was dissolved and its existence was wholly terminated under the laws of the State of Wisconsin. Oral argument on the motion was held before this Court on December 15, 1954, and briefs were filed on both sides. Thereafter, on February 17, 1955, this Court entered an order in Docket No. 54860 as follows: "ORDER "On November 22, 1954, respondent filed herein a Motion To Dismiss this proceeding for lack *213 of jurisdiction. A hearing was held on said motion on December 15, 1954, at which time both parties appeared by counsel who presented oral arguments. Petitioner's counsel filed at that time a brief in opposition to respondent's motion. The motion was taken under advisement and time was granted to counsel for respondent to file a memorandum in reply. After due consideration of said motion, the arguments of counsel thereon, both oral and written, and the entire record herein, it is "ORDERED: that respondent's said motion to dismiss for lack of jurisdiction be and it is hereby granted, and it is "ORDERED: that this proceeding be and it is hereby dismissed for lack of jurisdiction." * * *
At the same time this Court entered a Memorandum Sur Order as follows: "It appearing that the petition herein was filed after the corporate existence of Transit Bus Sales had ceased for all purposes and at a time when no one was empowered to act for or in the name of Transit Bus Sales, the respondent's motion to dismiss the petition must be granted for lack of jurisdiction. The Court by this Memorandum Sur Order wishes to emphasize the fact that our order of dismissal does not in any way constitute a finding *214 or determination of the tax liability of Transit Bus Sales and is not to be considered as such in any other proceedings." The statutory notices issued by respondent on October 19, 1954, determined that the following individuals were transferees of Transit Bus Sales: Edward M. Goemans, John P. Wagner, Leo G. Roemer, Grace Patricia Goemans Trust, Mazie F. Wagner, Agnes G. Roemer, Christine Goemans, Margaret Elizabeth Goemans Trust, John Walter Goemans Trust, and Jacqueline Gretchen Goemans Trust. On January 13, 1955, all of these 10 persons, as transferees or alleged transferees, filed petitions with this Court alleging error on the part of respondent in his determination of the various deficiencies in the tax liability of Sales, the petitioner in Docket No. 50433, and alleging error in determining that any of them were transferees of Sales, except that Goemans, Wagner, and Mazie admitted receiving distributions of assets in liquidation of Sales, on September 27, 1950. In each of the 10 petitions filed in Docket Nos. 55923 through 55932, the petitioner pleaded that the period of assessment of Federal taxes against Sales for each of the taxable years 1941 to 1947, inclusive, had expired *215 more than one year prior to October 19, 1954, and that assessment of liability against said petitioners as transferees of Sales was barred by the provisions of section 311(b) of the Internal Revenue Code. In his answer, as amended, to each of said petitions, respondent affirmatively alleged that the statute of limitations did not bar assessment and collection of the transferee liability for each of the years 1941 to 1947, inclusive, by reason of the fact that valid consents (Form 872) were duly executed by Sales; that timely notices of deficiency for the years 1941 to 1947, inclusive, were issued to Sales in response to which petitions were filed with this Court and given Docket Nos. 50433 and 54860; and that in any event the petitioner in each Docket Nos. 55923 to 55932, was estopped from contesting the validity of the consents (Form 872) filed by Sales which purported to extend to and beyond October 19, 1954, the date for assessing and collecting the asserted transferee liability. No statutory notice was addressed or issued to Sales for its taxable years 1941 through 1946, on or prior to June 30, 1951. No statutory notice was addressed or issued to Sales for its taxable year 1947 *216 on or prior to March 15, 1951. No transferee notice was issued on or prior to June 30, 1952, with respect to the tax liability of Sales for any of its taxable years 1941 through 1947. The statutory notices of deficiency issued by respondent to each of the petitioners herein were timely. None of the petitioners herein is liable as a transferee of Transit Bus Sales other than for amounts received by Wagner, Goemans, and Mazie on dissolution of Sales, which amounts are as follows: Goemans, $77,004.33; Wagner $52,502.95; Mazie, $24,501.37, and to an extent not exceeding unpaid Federal taxes of Sales. Compensation At the first meeting of the directors of Sales, Goemans was employed under a written employment contract to "take charge of the general direction of Sales for the corporation, the keeping of its books and records and such other duties * * * as shall be required of him by the Board of Directors hereafter * * *." Goemans was to receive for his $200services per month, or an amount equal to 5 per cent of the corporation's gross sales, whichever was greater. The employment agreement also provided for reimbursement for Goemans' use of his own car at the rate of five cents per mile, *217 and for reimbursement of actual traveling, entertaining, and incidental expenses incurred on behalf of the corporation. On January 5, 1938, the directors of Sales adopted the following resolution: "That the corporation retain Mr. Richards to assume responsibility over financial negotiations and general control of the corporation and Mr. Wagner to assist in sales promotion and manufacturer negotiations, during the year 1938. That they each be paid therefor 40% of the net profits of the corporation for the year 1938." Compensation so determined was paid for the year 1938, and also for the years 1939 and 1940, without further action by the board. On March 24, 1938, Sales made a new employment agreement in writing with Goemans, for one year, effective commencing January 1, 1938, under which Goemans was to receive the same salary and commissions as before, plus the amount of $125 a month as reimbursement for his traveling and promotional expenses. This agreement was duly extended by the board of directors to remain in force throughout 1939. Goemans was paid in accordance with this contract during 1938 and 1939. On March 14, 1940, Sales made a new written employment agreement with Goemans *218 effective January 1, 1940, under which he was to be paid a commission of one-fourth of the gross profit on the sale of Ford buses and one-third of the gross profit on all other sales with a drawing account of $500 per month against commissions. The agreement, by its terms, was to run for one year. Goemans discussed the reasons for the agreement with the other directors and Wagner. The new agreement was deemed fair because it eliminated the possibility that Goemans's prior rate of commissions based on gross sales might have taken the entire profit, and also because a percentage of gross profit would be incentive to sell at top price rather than to reduce selling price to obtain a large order which might yield a higher commission to Goemans since it would be geared to total selling price. Though the employment agreement was not formally renewed until 1948, Goemans was compensated during all of the years 1940 through 1947 in accordance with the March 14, 1940, agreement. The profit to Sales on the sale of Aerocoach business was less than the profit on Ford buses. Richards left Sales in February of 1941. His stock was purchased in part by Goemans and in part by Mazie, as stated before. *219 Goemans was elected president and general manager of the corporation and thereafter received the same compensation which had formerly been paid to Richards, namely, 40 per cent of the net profits of the corporation. He also continued to receive the commissions provided for in the employment agreement of March 14, 1940. In June of 1941, this compensation was reduced to 35 per cent of the net profits at a suggestion made by officers of the Marine National Exchange Bank of Milwaukee. The suggestion was prompted by a desire on the part of the bank to have Sales increase its capital in connection with borrowing from the bank. There was no corporate action authorizing or approving such payments to Wagner and Goemans and no employment agreements were entered into by Wagner and Goemans during the taxable years 1941 to 1947, inclusive. At no time during its existence did Sales declare and pay dividends as such to its stockholders. On December 4, 1944, Goemans advised the corporation that he and Wagner were willing to foregoing their salaries of 35 per cent of the net profits of the corporation, because they wished to reduce their activities on behalf of the corporation. The arrangements between *220 the corporation and Goemans with respect to commission on sales and expenses was to remain in full force and effect. The following day, Goemans and Wagner agreed in writing to discontinue their former salaries of 35 per cent of the net profits of Sales, effective January 1, 1945. On March 11, 1948, Goemans, as president of Sales, made a new written employment agreement with Goemans, as employee of Sales, reducing his commission to one-fourth of the gross profit on all sales against which a drawing account of $500 per month was to be allowed. Subsequently, on August 22, 1948, Goemans agreed to limit the compensation payable under his contract of March 11, 1948, to a monthly maximum not to exceed the net profit before taxes, but with a minimum of $500 per month. Effective January 1, 1949, Goemans, as president of Sales, made a new written employment agreement with Goemans, as employee, whereby he was to receive 50 per cent of the net profit of the corporation before taxes, with a guaranteed salary of $500 per month and all expenses. In August of 1946, Goemans purchased a home in California and moved his residence there. Thereafter he came to Milwaukee once a month for the next three *221 months and later only once every six weeks or two months to attend to the business of Sales. In 1941, Goemans and Wagner executed an unlimited guarantee to American State Bank of Milwaukee, guaranteeing the obligations of Sales. In the same year a limited guarantee of up to $50,000 was given by the same parties for the same reasons to Merchandise National Bank of Chicago. The latter guarantee was increased to $75,000 in 1942. These guarantees continued throughout the years 1941-1945, inclusive, and Sales from time to time borrowed its working capital from the banks mentioned on the basis of these guarantees. The personal guarantees of Wagner and Goemans were necessary to obtain direct and indirect credit for Sales. Much of the paper of Sales Company #1, discounted by Sales, was endorsed personally by Goemans and Wagner. Wagner was influential in financing circles, being a director of various companies, including the Chicago, Milwaukee, and St. Paul Railway and Wisconsin Public Service Corporation. Originally, Wagner gave the guarantees for financing. Later, Richards joined him in guaranteeing loans for Sales. After Richards left, and before Goemans joined him in giving a personal *222 guarantee, Wagner alone took care of the financing arrangements. During all years of existence of Sales (1937-1950) its sales, the compensation it paid Goemans and Wagner (including Goeman's commissions), and the ratio that such compensation bears to sales are set forth below: Sales of Transit Bus Sales and Compensation Paid
Pony
Year
Ford
Aerocoach
Gar Wood
Cruiser
Other
Total
1937
$ 8,812.29
$ 8,812.29
1938
60,138.91
$95,051.82
155,190.73
1939
143,508.74
9,764.40
$ 2,013.56
1940
131,703.28
$ 50,571.14
$11,660.85
4,746.80
198,682.07
1941
315,239.33
68,527.21
29,680.91
33,153.21
446,600.66
1942
492,412.85
126,845.63
13,290.40
66,937.08
669,485.96
1943
481,236.22
57,526.93
17,902.32
556,665.47
1944
1,053,800.27
4,693.60
1,058,493.87
1945
1,020,636.62
43,481.26
1,064,117.88
1946
798,510.52
218,098.96
1,016,609.48
1947
1,774,239.72
370,961.50
2,145,201.22
1948
71,488.87
541,353.31
1949
330,665.00
330,665.00
1950
116,189.01
116,189.01
Edward M. Goemans
John P. Wagner
Amount
% of Sales
Amount
% of Sales
1937
$ 2,131.30
24.0
1938
8,215.21
5.3
$ 3,938.32
2.5
1939
12,764.33
8.2
6,447.45
4.2
1940
12,898.64
6.5
4,207.80
2.1
1941
39,559.76
8.7
16,500.00
3.7
1942
50,230.16
7.2
15,435.95
2.2
1943
39,264.20
7.05
8,699.49
1.56
1944
68,142.05
6.44
20,651.56
1.95
1945
17,523.77
1.65
1946
21,084.29
2.07
1947
32,351.88
1.51
1948
15,394.02
2.84
1949
5,666.65
1.71
1950
5,500.00
4.73
Geisler *223 was the only full-time officer of Transit. He was considered by Fitzgerald, president of Transit, to be a "supersalesman." He was considered the moving force behind the success of the Ford transit bus. When he suffered a stroke, which permanently incapacitated him, both Goemans and Jobes considered the future of the Ford bus to be hopeless. The amount which Geisler was paid by Transit for the years 1941-1943, inclusive, along with Transit's gross sales for those years and the ratio of Geisler's compensation to gross sales is set forth below: Geisler's
Year
Gross Sales
Compensation
Amount
%
1941 *
$2,241,025.46
$19,000
0.8
1942 **
5,030,696.35
26,000
0.5
1943 **
4,495,454.67
27,000
0.6
Respondent made the following determination and disallowed the following amounts as deductions to Sales for compensation paid to Wagner and Goemans by various of the organizations for the years 1941-1945, inclusive: Year
Received from Transit Bus
E. M. Geomans
Sales
J. P. Wagner
1941
Direct
$39,559.76
$16,500.00
Allowed
26,059.76
10,000.00
Disallowed
$13,500.00
$ 6,500.00
1942
Direct
$50,230.16
$15,435.95
Allowed
36,730.16
8,935.95
Disallowed
$13,500.00
$ 6,500.00
1943
Direct
$39,264.20
$ 8,699.09
Through: Midwest
$ 6,000.00
Transportation Co.
Transit Bus Parts
6,928.40
12,928.40
Totals
$52,192.60
$ 8,699.09
Allowed
42,192.60
8,699.09
Disallowed
$10,000.00
None
1944
Direct
$68,142.05
$20,651.06
Through: Midwest
$ 6,000.00
Transportation Co.
Transit Bus Parts
14,352.61
20,352.61
Total
$88,494.66
$20,651.06
Allowed
48,494.66
15,651.06
Disallowed
$40,000.00
$ 5,000.00
1945
Direct
$17,523.77
None
Through: Midwest
$ 6,000.00
Transportation Co.
Transit Bus Parts
22,078.87
Transit Bus Sales Co.
12,814.42
40,893.29
Total
$58,417.06
None
Allowed
48,417.06
None
Disallowed
$10,000.00
None
*224 The amount paid Goemans by Sales for commissions on the sale of buses, for each of the years in question herein, was reasonable. The amounts paid Goemans by Parts, Midwest, and Sales Company were not disallowed by respondent as deductions taken by said partnerships. Respondent regarded the income of said partnerships to be income of Sales. We have found, supra, that said three partnerships were valid for income tax purposes. No part of respondent's disallowances to Sales of compensation paid to Goemans may be attributed to compensation paid to Goemans by any of said three partnerships. The compensation paid by Sales to Goemans was excessive to the extent of the following amounts for the respective years indicated below: 1941
$4,071.43
1942
6,615.41
1943
3,728.36
1944
8,850.67
The compensation paid by Sales to Wagner was excessive to the extent of the following amounts for the respective years indicated below: 1941
$6,500
1942
6,500
1944
5,000
Expenses Throughout the taxable years 1943 through 1945, Goemans received from Sales an allowance of $250 a month to cover his expenses in the State of Wisconsin for travel and entertainment on behalf of Sales. During this period, Goemans called on and entertained *225 bus operators in Port Washington, Sheboygan, Two Rivers, Manitowoc, Sturgeon Bay, and 25 other cities in Wisconsin, located in all parts of the state. Some of these operators were taken on trips by Goemans to other parts of the state. In addition, Goemans frequently entertained bus operators in his home when they came to Milwaukee, and entertained Ford bus men from Detroit, taking them towausau and other cities to call on operators. During each of the years 1943, 1944, and 1945, Goemans kept a complete ledger record of all of his expenses for travel and entertainment in Wisconsin on behalf of Sales. For each of the years 1943, 1944, and 1945, Goemans expended no less than $3,000 for travel, entertainment, and promotional work in Wisconsin on behalf of Sales, and reimbursement by Sales to him of such amount is reasonable. Opinion I. Statute of Limitations Transit Bus Sales was a Wisconsin corporation organized in 1937, and dissolved on September 27, 1950. It filed its corporate tax returns for the years 1941 to 1947, inclusive, on March 16, 1942, and on March 15 of each of the years 1943 to 1948, inclusive. Before dissolution, consents (Form 872) waiving the period for assessment *226 for the years 1941 to 1946, inclusive, were duly executed by Transit Bus Sales and the Commissioner extending the period for assessment to June 30, 1951. On dissolution of the corporations, Goemans, Christine, and J. E. Cherti constituted the board of directors of Transit Bus Sales. Goemans was president of the corporation at that time, Christine was vice president, and J. E. Cherti was secretary-treasurer. After September 30, 1950, consents extending the period for assessment against Transit Bus Sales for the years 1941-1945, inclusive, to June 30, 1953, and for the years 1946 and 1947 to June 30, 1954, were executed by Goemans on behalf of Transit Bus Sales and by the Commissioner. Petitioners challenge the validity of the consents executed after the corporation had been dissolved on the grounds that Goemans had not the power to execute consents for the dissolved corporation. They argue that under Wisconsin law the board of directors became the trustees of the assets of the corporation and no one of them could extend the time for assessment without the consent of the others, least of all in his capacity as president of the corporation. Respondent argues, on the other hand, that *227 Goemans had the power, under Wisconsin law, to execute the consents, and, if he did not, that petitioners are estopped from challenging the validity of the consents. It is clear from the decided cases that "a corporation which has been dissolved is as if it did not exist" and that "if the life of the corporation is to continue even if only for litigation purposes, it is necessary that there be some statutory authority for the prolongation." Oklahoma Gas Co. v. Oklahoma, 273 U.S. 257, 259. It is therefore appropriate to examine the Wisconsin statute which governed the powers of the officers and directors at the time Transit Bus Sales was dissolved. Wisconsin Statute, 1949, Sec. 181.02, provides: "181.02 Continuance after dissolution. All corporations whose term of existence shall expire by their own limitation, or which shall be dissolved, shall nevertheless continue to be bodies corporate for 3 years thereafter for the purpose of prosecuting and defending actions, and of enabling them to settle and close up their business, dispose of and convey their property and divide their assets and for no other purpose; and when any corporation shall become so dissolved the directors or or managers *228 of the affairs of such corporation at the time of its dissolution shall, subject to the power of courts to make a different provision, continue to act as such during said term of 3 years, with full power to elect officers, fill vacancies in the board of directors, settle its affairs, dispose of and convey all its property, collect the outstanding credits, pay the debts owing by such corporation and the costs of such administration and divide the residue of the money and other property among the stockholders or members thereof." It is clear, of course, and the proposition is not challenged, that the settling of a tax controversy with the Federal Government is within the scope of those matters with which the statute allows a corporation to concern itself during its winding-up period. While we have been cited to no Wisconsin case, and have found none, which concerns itself directly with the powers of officers and directors under the statute quoted above, nevertheless the statute is clear in its wording and import. The statute first sets forth the limits, both as to time and as to subject matter, within which the corporation will continue to exist in order to wind up its affairs. The "directors *229 or managers" of the affairs of the corporation have "full power" to perform those acts which will allow the corporation to wind up its affairs. Not only may the directors perform those acts, but they may also elect officers. If officers were deemed to have no power to act for the corporation during its winding-up period, but only the directors, there would be no purpose for the statute to have provided for the election of officers. It may be argued that only officers elected by the board of directors after the corporation has been dissolved may act for the corporation during its winding-up period. In the instant case no such election took place. However, we see no reason so to limit the import of the statute. The status of both the corporation and its managers under the statute is one of continuation from the pre-dissolution period. The statute states that dissolved corporations shall "continue to be bodies corporate," and Wisconsin courts consider them so. See Village of West Milwaukee v. Bergstrom Mfg. Co., 242 Wis. 137, 7 N.W. 2d 587 (1943). The directors shall "continue to act" during the winding-up period. There is no cleavage between the pre-and post-dissolution periods. After *230 providing that the directors shall continue to act, the statute enumerates the powers which the directors have. These powers are the usual powers of directors in any corporation. The statute merely makes clear that these powers are to exist even after dissolution although the time within which they exist, and the matters over which they might be exercised, are limited to winding up the affairs of the corporation. Furthermore, there is no requirement that officers be elected after dissolution. The statute merely allows the directors to elect officers during the winding-up period. If officers are elected, they may act on behalf of the corporation to wind up its affairs. If, however, officers are not elected, the statute does not provide that the officers duly elected before dissolution do not remain in office until removed or replaced, or that they are powerless to act. On the contrary, the wording and general import of the statute contemplate that the corporation will act for three years after dissolution as if it had not dissolved at all, within the scope of winding up its affairs. The statute makes this clear by providing not merely that the directors have the power to wind up the *231 affairs of the corporation, but that the directors shall continue to act for the corporation in their capacity as directors even to the extent of electing new officers if such action is deemed advisable. A comparison of the statute in question, which was adopted in 1945 (Wis. Stat. 1945, c. 572), with its predecessor, Wis. Stat., 1927, c. 534, 539, is worthy of note. Where, as we have seen, the statute in question provides that "the directors or managers * * * shall * * * continue to act as such * * * with full power to elect officers, fill vacancies in the board of directors, settle its affairs," etc., its predecessor statute provided that "the directors or managers * * * shall * * * continue to act as such * * * and shall be deemed the legal administrators of such corporation with full power to settle its affairs," etc. The emphasized phrases in the above quotations are peculiar to the statute quoted. The phrase "and shall be deemed the legal administrators" was omitted from the statute in question, and the phrase "elect officers, fill vacancies in the board of directors" was added. This change in the statute thus bolsters our interpretation, set forth above, that the directors collectively *232 are not the only persons who could act for Transit Bus Sales during its windingup period. The parties have stipulated that Goemans was president of the corporation on the date of dissolution. There is no evidence that he was removed or replaced by action of the directors, or that the office was declared vacant or abolished. To the contrary, there is every reason to believe that he continued in his capacity as president and was recognized as such. In Docket No. 50433, petition was filed in this Court by Transit Bus Sales. The petition was signed by George D. Spohn, John D. Best, and William C. Brunsell, counsel for petitioner. Goemans signed and swore to the required affidavit to the petition on petitioner's behalf, under date of August 24, 1953, stating, inter alia, that "he is president of petitioner Transit Bus Sales; that Transit Bus Sales is a corporation, and he makes this verification for and in behalf of petitioner and is duly authorized so to do; * * *" (See Exhibit Q, received in evidence without objection.) We have no doubt that Goemans did continue to serve as president of Sales, and as such, had the customary powers of a president to bind his corporation to the extent not *233 prohibited by the statute. That Goeman's action in executing the waivers on behalf of Sales was within his apparent authority as president is clear, and the consents must be taken as prima facie valid. Helen Epstein, 17 T.C. 1034, 1036 (1951); Charles D. Jaffee, 17 B.T.A. 675, 685 (1929). See also Virgil D. Dardi v. United States, 252 Fed. (2d) 670 (C.A. 9, Feb. 21, 1958). We need not review here the detailed facts set forth in our Findings which demonstrate that the consents were transmitted by the duly authorized counsel for Sales under circumstances which leave no doubt that such counsel believed them to be validly executed, and that respondent's representatives had every reason to accept them as such. We do add, however, that there is no evidence that Goemans was not president of Sales, or did not have authority to execute the waivers, petitioners' contentions in this respect being based upon legal conclusions and inferences in respect of which we find them in error. Since we find the consents were validly executed, we have no occasion to consider the argument of respondent to the effect that Sales, by its conduct, is estopped to deny their validity. See however, James M. Denton, 21 T.C. 295, 300, 301. *234 Having held that the consents were validly executed, we must now inquire whether the assessments were timely against Transit Bus Sales and against the transferees. Concerning the years 1941-1945, inclusive, the latest date for assessment appearing on the consents was June 30, 1953. Statutory notice of deficiency was issued against the corporation on June 23, 1953. Since the notice was issued within the three-year winding-up period, and since the last date on which assessment could have been made occurred within that period, the notice pertaining to the years 1941-1945, inclusive, was timely as against the corporation. Within 90 days of June 23, 1953, the date on which notice for the years 1941-1945 was issued against the corporation, and before the end of three years from the date of dissolution, Transit Bus Sales filed its petition with the Tax Court. The case was docketed as No. 50433. While statutory notices were not issued to the transferees until October 19, 1954, more than one year after the time for assessment would ordinarily have run against Transit Bus Sales and after the winding-up period had been completed, section 277, Code of 1939, suspends the running of the statute *235 of limitations against a taxpayer "if a proceeding in respect of the deficiency is placed on the docket of the Board, until the decision of the Tax Court becomes final, and for sixty days thereafter." Since there has been no decision to date with respect to Docket No. 50433, the notices against the transferees for the years 1941-1945, inclusive, were issued within one year from the time in which assessment could have been made against Transit Bus Sales, and were therefore timely, if assessment could have been against Transit Bus Sales after its winding-up period had terminated. Section 311(c), Code of 1939, states: "(c) Period for Assessment against Taxpayer. - For the purposes of this section, if the taxpayer is deceased, or in the case of a corporation, has terminated its existence, the period of limitation for assessment against the taxpayer shall be the period that would be in effect had death or termination of existence not occurred." In Signal Oil & Gas Co. v. United States, 125 Fed. (2d) 476 (C.A. 9, 1942), a case dealing with a corporation which was assessed after it had ceased to exist but before the statute of limitations had otherwise run for assessment against it, the *236 court interpreted the section which became section 311(c) as follows (p. 479): "It appears to us that Congress intended to create assessment proceedings to determine a taxpayer's liability, though a deceased person or a corporation which has become defunct by final dissolution. [Citations] Such an assessment is a determination that the deceased person or defunct corporation owed the tax, and we can see no reason why, in a proper proceeding, such an assessment cannot be made and both start the running of the statute and fix a liability against the assets of the dissolved corporation in the hands of transferees." We agree with the Signal Oil & Gas Co. case that section 311(c) allows an assessment otherwise timely to be the basis for transferee liability even though the transferor corporation may be defunct and no longer responsive to any liability found against it. Thus, Transit Bus Sales could have been assessed, though its winding-up period had been completed, and the notices to the transferees were timely. Concerning the years 1946 and 1947, the consents purported to extend the time for assessment to June 30, 1954. On that date respondent issued a statutory notice of deficiency to *237 "Transit Bus Sales, c/o Edward M. Goemans," determining deficiencies for the taxable years 1946 and 1947 and an overassessment for the period January 1 through September 22, 1950. On September 23, 1954, Goemans, Wagner, and Mazie, as "transferees of Transit Bus Sales, a former corporation" filed a petition with this Court for review of the deficiencies determined against Transit Bus Sales for 1946 and 1947. The proceeding was assigned Docket No. 54860. As stated before, the statutory notices of transferee liability were issued on October 19, 1954. On February 17, 1955, this Court, pursuant to a motion to dismiss filed by respondent, and after oral argument and briefs were submitted, entered an order dismissing the suit for lack of jurisdiction. At the same time the Court entered a Memorandum Sur Order as follows: "It appearing that the petition herein was filed after the corporate existence of Transit Bus Sales had ceased for all purposes and at a time when no one was empowered to act for or in the name of Transit Bus Sales, the respondent's motion to dismiss the petition must be granted for lack of jurisdiction. The Court by this Memorandum Sur Order wishes to emphasize the fact *238 that our order of dismissal does not in any way constitute a finding or determination of the tax liability of Transit Bus Sales and is not to be considered as such in any other proceedings." We think that the notices to the transferees for the tax liability of Transit Bus Sales for the years 1946 and 1947 were timely. It would seem that only three factors could make the notices untimely, namely: (1) that the notices were not issued before one year from the date of expiration of limitations against the transferor; (2) that the notice of deficiency issued to Sales was untimely because it was made after the winding-up period had expired; (3) that the dismissal of the petitions filed by Transit Bus Sales acted as a determination either that the notice to it was untimely or that the liability was otherwise expunged. As we have seen, the first and second factors are not applicable. Statutory notices of deficiency against the transferees were issued on October 19, 1954, less than one year after the expiration of limitations against the transferor, and the fact that the winding-up period has terminated does not influence the timeliness of assessment against the transferor. Signal Oil & Gas Co. v. Commissioner, supra; *239 section 311(c), supra. Likewise, the third factor mentioned above is not applicable. The dismissal of the petition filed by Transit Bus Sales has no bearing on the liability of the transferees. As stated before, transferee liability may be predicated on an assessment against a defunct transferor. The dismissal of the petition by Transit Bus Sales was merely an acknowledgment that there was no jurisdiction in this Court to act on the issues presented in that petition. Union Shipbuilding Co., 43 B.T.A. 1143, 1145, (1941); D. J. Gay, 31 B.T.A. 580 (1934). That acknowledgment has no relation to the issues presented in the petitions now before the Court. In our view, then, the statute of limitations did not run against assessment of the transferees. II. Tax Liability of Sales The Commissioner added to Sales' income the net income attributed by petitioners to the other entities involved. In addition, he disallowed a portion of the compensation paid to Wagner and Goemans by Sales and the other organizations; he disallowed as an expense deduction $3,000 paid to Goemans in each of the years 1943-1945, inclusive; he disallowed depreciation deductions on buses at one time purportedly owned *240 by various of the entities, and taxed the profit on their sale at ordinary income rates. Petitioners complain that each of the enumerated adjustments was erroneous, and that the tax liability of Transit Bus Sales, based upon the adjustments, was erroneous, and that the tax liability of Transit Bus Sales, based upon the adjustments, was erroneously computed. A. Allocation of Income. Respondent determined that the income purportedly earned by the partnerships was taxable to Sales under section 22(a) or section 45, and that income from the sale of used buses purportedly earned by the aircraft corporations was taxable to Sales under section 45 or section 129. 1. The Partnerships. a. Section 22(a). If the purported partnerships actually functioned as such and were intended as separate and independent entities, section 22(a) does not apply to prevent recognition of the partnerships merely because the operations purportedly carried out by the entities could have been performed by Sales or because the same people owned or controlled all of the enterprises. Grenada Industries, Inc., 17 T.C. 231, 252, affd. (but appeal based on other issues) 202 Fed. (2d) 873, certiorari denied 346 U.S. 819; *241 Seminole Flavor Co., 4 T.C. 1215. A taxpayer has the right to separate various phases of his business into separate entities and to combine them as he sees fit. Estate of Julius I. Byrne, 16 T.C. 1234 (1951); Buffalo Meter Co., 10 T.C. 83. Where the parties intend separate entities, and in fact create them, such entities will be given recognition as such. Polak's Frutal Works, Inc., 21 T.C. 953 (1954); Coca-Cola Bottling Co. of Sacramento, 17 T.C. 101 (1951), affd. on other grounds, sub nom. Sellers v. Commissioner, 218 Fed. (2d) 380 (C.A. 9, 1955); Palm Beach Aero Corporation, 17 T.C. 1169 (1952); Chelsea Products, Inc., 16 T.C. 840 (1951), affd. on other grounds(C.A. 3, 1952), 197 Fed. (2d) 620. To determine intention, all of the circumstances surrounding the formation and operation of the partnership must be examined. See Commissioner v. Culbertson, 337 U.S. 733 (1949). (1) Midwest Transportation Company. We think that Midwest is entitled to recognition as a separate entity. Its substantial function was the purchase and leasing out of buses. Maxie and Christine were equal partners. They withdrew substantial sums from time to time during the existence of the partnership; *242 they became primarily liable to the bank on notes amounting to $40,000; Goemans was paid $500 per month for his services as manager; the partnership advertised in its own name; during the existence of the partnership Sales virtually discontinued its leasing operations; and upon dissolution the partners received the remainder of their interests in cash. As to motives prompting the formation of Midwest, we think that Sales was to some extent influenced by concern as to whether its customers would consider the bus leasing business in competition with them. At the same time, Sales believed that, in its leasing operations, Midwest would find it necessary to purchase buses from time to time, and would, to this extent, be a potential customer. Moreover, the ability of Sales to borrow on the basis of direct loans from the bank was limited. Sales needed its credit to finance the purchase of buses and could not borrow further in order to have buses available for leasing. While an important part of Sales' income before Midwest was organized resulted from the leasing of buses, the income was relatively small when compared to the income Midwest eventually earned. It appeared likely in 1942 that *243 both the business of leasing and of selling buses would shortly increase. It was reasonable for Sales to put itself in a position creditwise to take advantage of the potential increased demand. One way to accomplish this was to form an entity for the leasing of buses which would incur direct liability for buses to be used for leasing purposes, while Sales would only incur an indirect liability when it discounted the other entity's notes, for which credit the bank had placed no specific limit in amount. It is agreed that Midwest incurred no direct or indirect liability at the bank until 1944. It did, however, substitute its notes for those of Francis with Sales, and Sales could have discounted them at any time. At the same time, Sales could sell buses to Midwest and gain direct as well as indirect benefits from creating the entity. These considerations, we think, support a bona fide intention to form a partnership to take over the leasing business. That the business was operated as an entity separate from Sales is clear. Respondent argues to the contrary that the partners gave Goemans a power of attorney with full authority to conduct the business of the partnership; that he acted as *244 its general manager and personally supervised all of its activities; and that he was paid $500 a month for his services. These facts are true, and neither Mazie nor Christine furnished services of value. These are, of course, factors to be considered in determining the validity of the partnership. Nevertheless, there is no requirement in the law that the partners furnish services ( Commissioner v. Culbertson, supra) and there is no prohibition against employment of management or other services. The partners were financially responsible; risked their credit; agreed to share profits and losses; actually withdrew substantial profits; and on dissolution, received their respective interests in the assets of the partnership. Respondent also characterizes the predecessor of Midwest (a sole proprietorship of Goeman's brother) as a sham. We need not enter into a discussion of this assertion, because the income during the period of the sole proprietorship is not in issue, and because we do not think the predecessor activity casts any significant reflection on the bona fides of the partnership itself. We hold upon the basis of the foregoing discussion that Midwest was a valid partnership for *245 income tax purposes, and an entity separate from Sales. No part of its earnings are, for the purposes of this proceeding, attributable to any entity or person other than the partners. (2) Transit Bus Parts. The detailed facts relating to Parts are set forth in our Findings. The partnership was formed on December 28, 1942. Mazie and Christine were equal partners. While they contributed no cash capital at the time of the formation of the partnership, they obligated themselves for the purchase price of Sales' inventory of parts. Moreover, on September 4, 1945, each contributed $5,000 to capital. In 1946, they transferred the partnerships assets to Sales Company, and received their full equity in cash within the year 1946. They performed no active duties, but employed Goemans to manage the business for them, he receiving 25 per cent of gross profits for his services. Sales did not wish to handle parts for Ford buses. During the years 1937 through 1940, such parts were handled by Swendson Motor Company, a concern entirely separate from Sales. In May of 1941, however, because of the requirement to do so under the terms of their new contract with Transit, and because of the insistence of *246 Geisler, vice president of Transit, Sales put in a stock of parts. The parts business produced a profit of less than $200 after salaries from May through December 1941, and less than $1,000 for 1942. In addition to its unwillingness to handle the parts business, Sales was concerned over the fact that its agreement with Transit permitted the latter, on termination of Sales' franchise (after 60 days' notice) to repurchase the parts inventory of Sales at cost less 10 per cent. Sales desired to insulate itself against this potential loss by disposing of its parts inventory. See J. Roger DeWitt, et al., 30 T.C. - (filed April 9, 1958). Lesser concerns on the part of Sales were to keep as free as possible from problems arising under Wage Stabilization Regulations, and also to avoid legal complications which might arise from activities which might be deemed "doing business" by the sale of parts in jurisdictions in which it was not licensed as a foreign corporation. Although Parts bought from Sales without profit to Sales, and although some services advantageous to Sales were rendered to Parts by employees of Sales without separate compensation from Parts, the substantial activities of Parts *247 were kept separate from Sales, and accurate separate accounts and records were maintained. Respondent's argument in reply is to the effect that petitioners' testimony as to the reasons for their action in forming Parts is not to be believed, and that the partnership was a sham. We do not accept this view, and for much the same reasons expressed in relation to Midwest, supra, we hold that Parts was a valid partnership for income tax purposes, and an entity separate from Sales. No part of Parts' earnings are, for the purposes of this proceeding, attributable to any entity or person other than the partners. (3) Aerocoach Sales Company. This partnership was organized on May 1, 1944, to become a dealer in Aerocoach intercity buses. The partners and their interests were: Goemans, 33 1/3 per cent; Christine, 33 1/3 per cent; Wagner 16 2/3 per cent; Mazie, 16 2/3 per cent. Again, the detailed facts are set forth in our Findings, supra. We think it is clear that Aerocoach is entitled to recognition as a separate taxable entity. A small amount of capital was contributed by each partner. The partnership established credit with a bank and borrowed substantially, with direct liability on the loans. *248 It was also indirectly liable on substantial paper discounted at the bank. The partners made substantial withdrawals, and received the remainder of their interests upon dissolution. The partnership advertised separately from Sales, and bought and sold real estate. It was registered as a dealer in Aerocoach buses with the Wisconsin Motor Vehicle Department. As to motive, petitioners contend that the partnership was formed mainly to comply with Geisler's orders that the sale of Aerocoach buses should be dropped by Sales. Geisler was deceased at the time of the trial and testimony concerning his attitude came only from Goemans who said that Geisler threatened him to the effect that he must give up selling Aerocoaches "or else." We have no reason to doubt Goeman's statement, and we think that other circumstances corroborate his testimony. Geisler was interested only in the sale of Ford buses. While it is true, as respondent points out, that the Aerocoach but was not in competition with the Ford bus, Aerocoach being an intercity type and Ford being a transit type, it is also true, as petitioners point out, that Geisler was interested in Sales covering its territory thoroughly. The evidence *249 also suggests that Geisler was being hounded by other operators who wanted to handle more than one line of buses. Because of pressure exerted by Geisler, Goemans decided to divorce the Aerocoach business from Sales. To this end he approached Fitzjohn, who represented the manufacturer of Aerocoach buses, and asked if the Aerocoach franchise could not be shifted from Sales to a partnership. Fitzjohn agreed as long as Goemans would control the operations of the partnership. A partnership was thus formed, the partners giving Goemans a power of attorney to act for it. This action satisfied Fitzjohn. Goemans thereupon substituted Roemer as attorney in fact. Both Roemer and Goemans sold Aerocoach buses, and both were active in the operations of the partnership. The arrangement appears to have satisfied the distributors of both Ford and Aerocoach. We find that the parties did intend to operate the business as a partnership, and that the partnership formed and operated was a separate taxable entity. Only the fact that Roemer was paid by Sales while selling Aerocoach buses suggests the possibility of a different view, but in the light of all of the circumstances, we think it insufficient to *250 require us to hold the partnership to be invalid. We conclude, therefore, that Aerocoach was a valid partnership, that it was an entity separate from Sales, and that no part of its earnings are, for the purpose of this proceeding, attributable to any entity or person other than the partners. (4) Transportation Equipment Sales. The purported partners and their respective purported interests were as follows: Agnes Roemer, 10 per cent; Christine Goemans, 30 per cent; John P. Boynton, 10 per cent; Elizabeth Boynton, 16-2/3 per cent; Frank A. Nolan, 16-2/3 per cent; and Vera Nolan, 16-2/3 per cent. The detailed facts are set forth in our Findings. Petitioners claim that Equipment was organized at the insistence of Geisler to insure the continued sale of Ford buses to Frank Nolan's brother, who had purchased many Ford buses from Geisler as manager of a Detroit transit bus line, and who had, just prior to the formation of Equipment, taken over as manager of the Chicago Surface Line. Goemans did not want to give Frank Nolan an interest in Sales and for this reason consented to the formation of Equipment. It is clear, however, that control of the business was not substantially relinquished *251 to the partnership. Goemans's contract of employment provided that Goemans had the option to purchase the interest of any or all of the partners in Equipment at any time at book value. Goemans stated that this provision was inserted to prevent any trouble with the Nolans should the enterprise not work out. We think that this provision in the employment agreement can only be interpreted as manifesting an intention to assign to the purported partners so much of the income from the successful completion of certain business transactions as Sales wanted them to receive. Because of Sales' retained control, through Goemans, the partners were transferred nothing of value except a qualified right to participate in the profits of the proposed transactions. Even this right was subject to Goemans's power to purchase at any time any or all interests at book value. The only transaction entered into by Equipment was a sale of 10 buses to a Chicago concern. The sale was handled by Goemans. Nolan had no part in it, and the purchaser was not the company with which Nolan's brother was connected. Equipment secured the buses from Sales. Equipment was in a position to make the sale solely because Sales *252 countenanced the transaction. The so-called partnership existed merely at the sufferance of Goemans acting for Sales. We conclude that Sales, acting through Goemans, in essence, set up Equipment for convenience as the least troublesome means of getting the benefit of Nolan's influence with his brother, and for this practical purpose provided for Nolan to receive a share of the income based on what tangible benefits might accrue. There is no substantial evidence to indicate that the remaining "partners" were in any way significant to the "partnership." We hold that the so-called partnership was invalid for tax purposes and that it is not entitled to recognition as a separate taxable entity. Having held that the partnership was invalid, and since it is clear that its one transaction was at the sufferance of Sales, we hold that the income from the transaction is attributable and taxable to Sales. (5) Transit Bus Sales Company # 1 and # 2. Transit Bus Sales Company # 1 was a partnership organized on December 6, 1944. The partners and their respective interests were as follows: Wagner, 20 per cent; Mazie, 15 per cent; Mansgo Company, 60 per cent; Agnes Roemer, 5 per cent. Transit Bus Sales *253 Company # 2 was a partnership organized on May 1, 1946. The partners and their respective interests were Wagner, 12-1/2 per cent; Mazie, 12-1/2 per cent; and Mansgo Company, 75 per cent. Although, as above indicated, there were changes in the partnership interests, and the accounts of the two partnerships were kept entirely separate, nevertheless, from the standpoint of functions and operations, Sales Company # 2 was regarded and treated as an extension or continuation of Sales Company # 1. Moreover, while Sales Company # 2 was not given a new dealership contract by Sales, it operated under the contract given to Sales Company # 1, and all figures and calculations connected with Sales Company # 2 operations were based upon the original agreement between Sales and Sales Company # 1. All formal requirements for creating a partnership were complied with in the formation of the partnerships in question. A partnership agreement was entered into; a resolution was passed by the board of directors of Sales approving the transfer of its dealership functions to the partnership; a dealership contract similar to that between Sales and Transit and Sales and General American Aerocoach Company was *254 entered into between Sales and the partnership; the parties obtained the recognition from Transit that the partnership was henceforth a dealer in Ford buses, and the partnership was so registered with the State of Wisconsin. (Sales Company # 2 was not registered as a dealer, but, as stated above, was regarded as an extension of # 1.) Sales was at the same time registered as a distributor. Roemer was formally appointed attorney in fact, and when he decided to leave the business, appointed Goemans in his place, who, in turn, eventually delegated his authority to Doyne. When Sales Company # 2 was formed, Doyne was appointed its attorney in fact. Goemans spent the time necessary to break in Doyne as a successor to Roemer. The partners made substantial withdrawals from the partnership. Upon dissolution of Sales Company # 2, the bulk of the assets were transferred to Sales at book value and carried by the corporation as accounts payable. These accounts were reduced in each of the years 1948, 1949, and 1950, until, by the date of dissolution of Sales, the accounts were completely paid off. Large amounts of Sales Company # 1 paper were discounted with the bank, although all of it also bore *255 the endorsement of Sales, and some a personal endorsement of Goemans or Wagner as well. The reasons or motives for the formation of Sales Company are satisfactorily established. Sales, as a dealer, had a widely extended territory. Geisler of Transit, at least, believed it was not being adequately covered by Sales. The then existing circumstances pointed to an arrangement which would result in making Sales a distributor, and in the division of Sales' territory into areas to be covered by dealers. While Sales Company, at the outset, received substantially all of the territory as a dealer, it was contemplated that, when other dealers were arranged for, their respective territories would be taken away from Sales Company. A cancellation clause was put in the dealership agreement with Sales Company to permit this to be accomplished on 30 days' notice. Goemans, in this connection, approached several men in the bus business in an effort to arrange for dealerships out of Minneapolis, Denver and Chicago. While his efforts did not bear fruit, and subsequent circumstances, including the incapacitation of Geisler, caused a departure from the original plan, it was reasonable for the executives *256 of Sales to believe and act on the view that unless Sales became a distributor, and divided its territory among dealers, it risked the breaking-up of its territory and possible loss of its franchise. Another reason for the plan to set up dealerships was that Goemans desired to become less active in retail sales activities, although he was willing to continue to act for Sales in its functions as a distributor. Since Goemans had been a vital factor in promoting retail bus sales, his wish to discontinue such activity was of significance. It was at least doubtful that Sales could have kept up highly successful retail sales activities without Goemans. The dealership plans were in part a recognition of this. Respondent argues that the only difference between Sales being a dealer and Sales being a distributor was that whereas Sales formerly received a profit of about $1,000 per bus, it received after the formation of Sales Company a profit of only $400 per bus, the other $600 being received by the partnership. These figures, however, relate to gross profit, and as can be seen from the books, the partnership assumed many of the financial obligations necessary to market the buses. It is our *257 view that the gross income figures, of themselves, do not negative the bona fides of the intentions of Sales to arrange for dealerships or the bona fides of Sales Company # 1 or # 2. We refer in passing to the 5 per cent interest of Agnes Roemer in Sales Company # 1. This was arranged because she was opposed to her husband's traveling so much. It was hoped that, as a partner, she would become interested in the business and withdraw her opposition. This, while not of great import, had some significance because, in the light of Goemans' desires to curtail his retail sales activities, it became more important that Roemer continue or increase his activities. Respondent's argument with relation to Sales Company is, in substance, an attack upon the credibility of petitioners' witnesses - particularly that of Goemans. We think his testimony was substantially true, and is circumstantially corroborated. We do not think it helpful to extend our discussion to cover all of the detailed facts which are fully set forth in our Findings. We hold, upon consideration of all the facts related thereto, that Sales Company # 1 and # 2 were valid partnerships; that they were entitles separate from Sales, *258 and that no part of their earnings are, for the purposes of this proceeding, attributable to any entity or person other than the partners, except that, for reasons to be considered infra, the amounts of income distributable to Mansgo (itself a partnership) and through it to the four trusts, are taxable to Goemans. b. Taxability of Goemans, Wagner, and Roemer on Wives' Income from Partnerships. It will be noted that with respect to Equipment, which we have found not entitled to recognition as a partnership under section 22(a), we have held that the income is taxable to Sales. Respondent presents, as an alternative, the argument that the income attributed to the wives' interests in the partnerships should be taxed to their husbands on the theory that the partnerships are invalid. We disagree with respondent's position. Our discussion sustaining the validity of the various partnerships (other than Equipment) sufficiently answers, we think, respondent's contentions here. We find no more reason to tax the wives' partnership income to the respective husbands than we did to tax such income to Sales. The salaries paid to Goemans and Roemer by the partnerships were for their management services *259 rendered to such partnerships, and represented taxable income to them. Such services do not support the argument that the income of the wives as partners should be attributed to the husbands also. We do hold, however, that, as determined by respondent, the income distributable to Mansgo Company as a partner in Sales Company should be taxed to Goemans. It is true that the four trusts for Goemans' children, which made up Mansgo Company, were in all respects properly drawn up. They were irrevocable. Under the trust agreements, Goemans was left only with the power to add to corpus and, in the event of the death of a named trustee before a beneficiary reached majority, to appoint a successor trustee (not himself.) The trustees were given the power under the agreements to enter into a partnership to facilitate the investment of corpus. On the other hand, the trustees, at the suggestion of Goemans, formed Mansgo Company to pool the resources of the trusts. Mansgo appointed Goemans its attorney in fact. Goemans, in turn, delegated his authority to Roemer. Neither Goemans nor Roemer was a trustee of any of the four trusts. The trust corpus was deposited in a bank account from which only Goemans *260 or Roemer could withdraw funds. (Christine substituted for Roemer after he left the bus business, and at a time when K. W. Feld was trustee of three of the four trusts.) Thus, while in effect Goemans created the trusts and went through the form of paying in corpus, he retained, for practical purposes, complete control over the funds of the trusts, including the income and proceeds which Mansgo received from Sales Company # 1 and # 2. Mansgo had no business other than to invest its funds and distribute the income. The trusts had no control over the disposition of the funds purporting to belong to them. Goemans, on the other hand, was in a position to do what he wanted with the corpus and income. He had complete command over the income of Mansgo and over the economic benefits to be derived therefrom. Under the circumstances, we hold that the income of Mansgo, as found herein, is taxable to Goemans. See discussion and authorities cited in Paster v. Commissioner, 245 Fed. (2d) 381 (C.A. 8, 1957), certiorari denied 355 U.S. 876, affirming T.C. Memo. 1956-144 [15 TCM 721]. c. Section 45 and Section 129. In applying section 45, respondent combined the net income purportedly earned by the *261 various partnerships with that of Sales. In this he clearly erred. Palm Beach Aero Corporation, 17 T.C. 1169 (1952); Cedar Valley Distillery, Inc., 16 T.C. 870 (1951); Estate of Julius I. Byrne, 16 T.C. 1234 (1951); Chelsea Products, Inc., 16 T.C. 840 (1951), affd. 197 Fed. (2d) 620 (C.A. 3, 1952). As we stated in Cedar Valley Distillery, Inc., supra, at p. 876, section 45 was "not enacted to consolidate two organizations for tax purposes by ignoring one completely, * * *." The Commissioner is allowed by the statute to prevent distortion among controlled taxable entities, but not to consolidate net incomes. See, e.g., G.U.R. Company v. Commissioner, 117 Fed. (2d) 187 (C.A. 7, 1941); Regulations 111, section 29.45. Because of the foregoing, we need not discuss this issue further with respect to the partnerships. As to the income received by the four corporations, other than Sales, respondent taxed to Sales only that part of the net income derived from the sale of buses. This method has in it the vice discussed above, and respondent's determination must fail for this reason, if for no other. In addition, it is clear that Goemans was acting in his capacity as president of each *262 of the corporations when the buses were purchased by him on behalf of the corporations for resale. The corporations, not otherwise active at the time, had cash to invest, and Goemans made it clear that the bus transactions were too small to attract Sales. As to section 129, that section is not applicable where the corporations were not formed, and did not acquire property for tax evasion or avoidance purposes. Berland's, Inc., of South Bend, 16 T.C. 182. Our Findings clearly set forth the reasons for the formation of the corporations and the reason for the formation of four corporations rather than one. It should be noted also that some income was derived by each of the corporations directly from the particular activities for which the corporations were organized. These activities are far removed from those of Sales. It is likewise clear that the acquisition of the buses for resale was for a quick profit on turnover of idle funds, and not to syphon income from Sales or to get the benefit of additional exemptions. For the foregoing reasons we think respondent's determination under section 129 improper. 2. Expense Deduction Issue. In the years 1943, 1944, and 1945, Sales paid Goemans *263 $250 per month, for travel and entertainment expenses incurred or to be incurred in the State of Wisconsin. For expenses incurred outside the state, only the actual expenses were reimbursed. Respondent does not challenge that Goemans incurred some expense on behalf of the corporation in Wisconsin. He merely argues that the amount claimed is excessive, that petitioner has not proved otherwise, and that we must, therefore, resort to the Cohan rule to find the correct amount deductible by Sales, and as a corollary, the correct amount includible in Goemans' income. We hold that $250 a month was not excessive. Goemans testified to the number and frequency of his trips to customers within the state, and to entertaining done in Milwaukee and elsewhere to promote business, which expenses were included in the $250 per month allotment. His testimony was based on records kept substantially contemporaneously. His evidence was to the effect that none of the amounts in the account included anything for home entertainment for which he was not reimbursed. His books show that in two of the three years he spent over $3,000, the amount for which he was reimbursed; and in the other year the amount spent *264 was $2,938.88. We think it apparent from the record that in such other year his home entertainment expense was at least $61.12, assuming the amount is not de minimis, in view of expenditures of over $3,000 for travel and entertainment in the other two years. Respondent challenges Goeman's evidence on two grounds. One is that Goemans did not carry the book with him and only put down the amounts spent when he returned to the office. We do not think that this brief delay renders the testimony untrustworthy. Respondent argues further that certain amounts recorded in the book were personal expenditures. As we understand the testimony, however, these amounts were not included in the calculations making up the $3,000. Goemans testified from a ledger book containing his business expense account and personal expense account. The total was much greater than $3,000. Only business expenses, however, were charged against the $250 per month received from the corporation. Moreover, these charges did not include home entertainment. We hold, therefore, that $3,000 was properly deducted as an expense by Sales, and that respondent erroneously added $3,000 to the income of Goemans. 3. Compensation Issue. *265 In the usual situation where at least a majority of the board of directors is disinterested, the action of the board is entitled to weight when considering whether or not amounts paid by a corporation to its officers were reasonable within the meaning of section 23(a). Even under such circumstances, the board's action is not conclusive or controlling upon respondent or this Court. When, as here, however, the corporation has only a few shareholders and they are the officers and directors who control the corporation and fix their own compensation, their action must be carefully scrutinized to prevent the allowance of deductions under the guise of compensation of amounts which are in fact dividend distributions, and, under such circumstances, little weight need be given to the action of the board. The Barto Co., 21 B.T.A. 1197 (1931); Crescent Bed Co., Inc., v. Commissioner, 133 Fed. (2d) 424, affirming 46 B.T.A. 1280; Marble & Shattuck Chair Co., 39 Fed. (2d) 393, affirming 13 B.T.A. 657. During the years 1941 to 1944, inclusive, Wagner and Goemans each received 35 per cent of the net profits of the corporation pursuant to action by the board so fixing their salaries. In addition, *266 Goemans received substantial commissions, based on sales, for his services as salesman and manager of the corporation. We think that petitioners have failed to prove that the amounts paid Wagner by Sales in 1941, 1942, and 1944, and the amounts paid Goemans in his capacity as president in the years 1941-1944, inclusive, (as distinguished from amounts paid to him in his capacity as salesman and manager) were reasonable to the extent that they exceeded the amounts herein allowed. Petitioners rely on the testimony of socalled expert witnesses; on the fact that the salary arrangements were entered into before the years in which compensation is challenged by respondent; and on the fact that salaries were made contingent upon the success of the business, which they attribute substantially to the personal services rendered by the two men. There is testimony from bank officials and others to the effect that the compensation in question was reasonable. We note especially the testimony of the president of the Marine National Bank in Milwaukee that Goemans and Wagner agreed to reduce their compensation from 40 per cent of the net profits to each to 35 per cent, in order to allow Sales to accumulate *267 capital. This testimony is clearly entitled to weight to the extent that it indicates, from the banker's perspective, the total amount which could safely be withdrawn from the corporation. We think, however, that our inquiry is somewhat different from that in which the bank appears to have been primarily interested, in that, given the fact that 70 per cent was a reasonable amount to be withdrawn, we must still concern ourselves with the question of whether or not the amounts paid to Wagner and Goemans were reasonable as compensation and as a coordinate factor, how much, if any, represented disguised dividends. The bank was interested in the limit of amounts to be withdrawn, but was not concerned with whether they were withdrawn as salaries, dividends, or both. For the purpose of deciding the issue before us, however, the distinction between the two is vital. Seventy per cent being the maximum to be withdrawn, there is strong indication that, in light of the fact that Sales paid no dividends, those in control of the corporation intended to make withdrawals in the form of deductible items to the fullest extent, without paying anything in the way of dividends. Wagner gave his personal *268 guarantee to the bank for credit extended to Sales; he contacted Crowley and, through him, the president of a Chicago bus line, which contacts, when followed up, led to the sale of about 60 buses; he contacted the Milwaukee bus line, the biggest bus operator in the state, which ultimately opened up all of Wisconsin for the sale of buses by Sales; and it was he who obtained the original franchise to allow Sales to sell Ford buses. Goemans, in his capacity as president, contributed services of a like nature. He gave a continuing guarantee to establish and reenforce Sales' credit; he kept up contacts with Transit and Geisler; he acquired the Aerocoach and Pony Cruiser franchises. The services of both Wagner and Goemans, while valuable and deserving of compensation, were sporadic events which took up an inconsiderable portion of the time of each of the men. We do not think they justify anything like 70 per cent of the net profits as compensation. The nature of the business was such that it is unreasonable to attribute almost three-fourths of its net income to services such as those described above. The fact that no dividends were declared lends color to the obvious motive of tax saving *269 as a factor to be considered, especially where the fixing of compensation is controlled by those who will benefit indirectly from the form in which it is taken. Moreover, Wagner was not an officer, and was active in serveral other business pursuits. Goemans served Sales for the most part in his capacity as salesman and general manager. Wagner's activities for Sales were most important at and immediately after the formation of the corporation. They diminished considerably through the years. Under all of the circumstances we think that the record before us justifies 20 per cent, but no more of the net profits as reasonable compensation to Goemans in 1941 to 1944, inclusive, as president of Sales (in addition to his commissions above referred to) and that only the amount determined by respondent as reasonable compensation to Wagner in the years 1941, 1942, and 1944, is justified. The amounts paid in excess of the above constituted a dividend in disguise and should be restored to the income of the corporation. As to other compensation received by Goemans pursuant to commission contracts, as indicated above, we do not think the amounts paid unreasonable. The contract with Sales was entered *270 into before it could be predicted how well the corporation would do, and was intended as an incentive to the better performance of Goemans' duties as manager of Sales. While the amounts he received were large, they were not excessive considering that the success of the corporation was due largely to his efforts in these respects. Contracts providing for compensation of sales personnel which are contingent upon the success of the corporation are looked upon liberally by the courts when considering issues similar to those presented here, where the contract for compensation was entered into before the success of the business was assured, and measured reasonably the value of the services to be performed. Austin v. United States, 28 Fed. (2d) 677, (C.A. 5, 1928); Baltimore Dairy Lunch, Inc. v. United States, 231 Fed. (2d) 870, (C.A. 8, 1956); Streckfus Steamers, Inc., 19 T.C. 1 (1952). 4. Sale of Buses. This issue concerns the tax treatment of the gain from the sale of certain used buses by Midwest, Sales Company, Aerocoach, and three of the four aircraft corporations. Our Findings set out the facts of record and our conclusions with respect thereto. A brief statement of our reasoning *271 is all that is required here. Our conclusion that Midwest was a valid partnership for tax purposes disposes of the present issue with respect to it since the individual tax liabilities of Christine and Mazie are not in issue in these proceedings. We may point out, however, that Midwest was in the business of leasing buses, and that the buses referred to in our Findings were all used for that purpose. Respondent points only to the fact that Midwest twice advertised buses for sale. (One ad ran for several months.) But the income he taxes was not derived from the sale of the buses so advertised. And the buses, the income from the sale of which he does tax, were all used in the leasing business. We have concluded from the foregoing that the buses sold by Midwest were not held for sale to customers in ordinary course but were section 117(j) assets used in Midwest's business. Depreciation deductions thereon were therefore proper and the gain on sale of these assets is taxable at capital gain rates. We think the situation different with respect to the buses sold by the other organizations. Exhibit 32 shows that Aerocoach sold three 1937 Yellow Coach buses. They were acquired on March 31, *272 1946. Aerocoach was in the business of selling new Aerocoach buses, and while there is some indication that the buses in question here were used for leasing, there is no reason why they might not also have been held for resale, and merely leased until a satisfactory price could be received. Petitioners have failed to prove that they were not so held, and accordingly the gain on sale is taxable at ordinary income rates. Transit Bus Sales Company was in the business of selling new Fords. Our Findings show that it acquired two Twin Coach buses in 1946. The treatment we have accorded the sale of these buses, and the reasons therefor, are the same as with Aerocoach. Hence, the gain constitutes ordinary income. We need not assume the reason for the acquisition of the buses in the case of the aircraft corporations. It is clear that the buses were bought for resale in the ordinary course of business. Manifestly then, the profit constitutes ordinary income. The two automobiles sold, one each by Aerocoach and Sales Company, were used to carry parts and for other business purposes. They were not held for resale to customers in the ordinary course of business and the gain on sale is taxable at *273 capital gains rates under section 117(j). III. Transferee Liability of Petitioners. Since we have held, supra, that the assessments against petitioners as transferees were timely made, we next consider their liability as transferees on the merits. Under section 311, Code of 1939, transferee liability is premised upon the transfer of property of the transferor to the alleged transferee for less than adequate consideration or in fraud of creditors, and in the former situation upon the transferor being insolvent at the time of the transfer, being rendered insolvent by the transfer, or upon the transfer being one in a series of liquidations which eventually renders the transferor insolvent. J. Warren Leach, 21 T.C. 70 (1953); James M. Denton, 21 T.C. 295 (1953). As to these elements of liability, respondent has the burden of proof. Section 1119(a), Code of 1939. On the issue of transferee liability, we hold that Sales was not insolvent at the time of any transfers to which we give effect, except the final distributions in liquidation in 1950 as to which last transferee liability is admitted by the petitioners receiving the distributions, subject to contentions based on the defense *274 of limitations (which we have disposed of supra, contrary to petitioners' view) and the claim that respondent erred in determining any deficiency as to Sales. The deficiencies as to Sales will be determined under Rule 50 in accordance with the conclusions we have expressed supra. Respondent argues first that Sales became insolvent by the end of 1943, and remained insolvent thereafter until it was dissolved in 1950. Secondly, respondent argues that each of the claimed transfers or diversions from Sales was part of a series of transfers continuing until liquidation which rendered the corporation insolvent as of the date of liquidation. Thirdly, respondent argues that the diversions were each part of a plan to hinder, delay, or defraud creditors, and that under the Uniform Fraudulent Conveyance Act, which has been adopted in Wisconsin, no proof of insolvency need be introduced to reach the property transferred. We find no factual support for the last two contentions. Moreover, in every case of which we are aware in which a distribution has been held to be one in a series leading to complete liquidation, a plan of liquidation, either formal or informal, was in existence, or there was *275 some evidence of an intent to liquidate, and the distribution was made pursuant to such plan or intent. See e.g., Caire v. Commissioner, 101 Fed. (2d) 992 (C.A. 5, 1939), affirming Memorandum Opinion of this Court, dated September 28, 1937; Aurore B. Benoit, 25 T.C. 656; Bates Motor Transport Lines, Inc. v. Commissioner, 200 Fed. (2d) 20 (C.A. 7, 1952), affirming 17 T.C. 151. In the instant case, we find no evidence that the distributions were made pursuant to an intent to liquidate or a plan of liquidation, even informal. Likewise, there is no evidence that the transfers caused or were part of a series of steps causing insolvency. We note in passing that Transit Bus Sales continued actively to carry on its business for some three years after the last of the partnerships and corporations had been dissolved, or became unassociated with Transit Bus Sales. Likewise, no evidence of intent to hinder, delay, or defraud creditors or the United States in respect of such transfers is shown in the record. While we recognize that an intent to hinder, delay or defraud the Government of its taxes on the part of a transferor may be found before the tax liability has accrued, the issue is nevertheless *276 one of fact which, in the instant case, is not supported by the evidence. Our determinations will result in some deficiencies as to Sales which are unpaid. Respondent, in establishing transferee liability therefor, must prove what amount was transferred to each of the alleged transferees, and that Sales was insolvent at the time of the various transfers or was rendered insolvent thereby. We think respondent has failed in his proof as to these items, except for amounts received by Wagner, Goemans, and Mazie upon liquidation of Sales in 1950. As a basis for his claim of insolvency as to Sales, respondent adds to Sales' liabilities the amounts of the deficiencies determined by him with respect to Sales. We, however, take into consideration only those of respondent's determinations which we have approved, and must eliminate those which we have rejected. Thus, the determinations to which we give effect in relation to Sales' deficiencies are the treatment we have given to the income of Equipment, and the amounts of disallowance of deductions by Sales attributed to excessive salaries, to the extent we have approved such disallowances. While the precise deficiencies to be determined with respect *277 to Sales must await determination under Rule 50, it is obvious from our Findings and conclusions set forth supra, that Sales had sufficient net assets in the years in which the added tax liability will be accrued to pay any such liability which may be determined without being thereby rendered insolvent. The net assets of Sales per books for the years in which added tax liability was incurred were: 1941
$48,369.22
1942
62,798.86
1943
69,033.45
1944
79,554.54
1945
98,662.55
The amounts added to Sales' income, or disallowed as deductions to Sales, are as follows: 1941
$10,571.43
1942
13,115.41
1943
3,728.36
1944
13,850.67
1945
10,382.97
The cumulative total of these additions and disallowances for any year is less than the net assets as set forth above. It is obvious, therefore, that the cumulative total of the tax on such additions and disallowances for any year will be less than the net assets as set forth above. Respondent has made some adjustments in the book figures, but they are not sufficient to require any change in principle from the position we take on the insolvency issue. We think it clear, therefore, that respondent has failed to prove that Sales was insolvent at the time of the transfers, and *278 the alleged partners in Equipment, and Wagner and Goemans, to the extent they received excessive compensation, are not liable as transferees with respect to transfers made to any of them by Sales in the years prior to its dissolution in 1950. Petitioners do not contest the fact that the stockholders received the remaining assets upon liquidation. Either under the trust fund doctrine or under the principles of transferee liability, since all of the partnerships were by this time dissolved and the accounts payable to them satisfied, these stockholders are liable as transferees. The stockholders and the amounts each received are as follows: John P. Wagner
$ 52,502.95
Mazie F. Wagner
24,501.37
Edward M. Goemans
77,004.33
$154,008.65
Wagner, Mazie, and Goemans are, therefore, liable as transferees to the extent of the deficiencies to be determined with respect to Sales under Rule 50, not, however, to exceed the amounts distributed to said transferees, respectively, in 1950. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Edward M. Goemans, Docket No. 50431, Leo G. Roemer, Docket No. 50432; Transit Bus Sales, Docket No. 50433; Grace Patricia Goemans Trust, by Christine Goemans, Trustee, "Alleged" Transferee of Transit Bus Sales, Docket No. 55923; Mazie F. Wagner, Transferee of Transit Bus Sales, Docket No. 55924; Edward M. Goemans, Transferee of Transit Bus Sales, Docket No. 55925; Leo G. Roemer, "Alleged" Transferee of Transit Bus Sales, Docket No. 55926; Agnes G. Roemer, "Alleged" Transferee of Transit Bus Sales, Docket No. 55927; Christine Goemans, "Alleged" Transferee of Transit Bus Sales, Docket No. 55928; Margaret Elizabeth Goemans Trust, by Christine Goemans, Trustee, "Alleged" Transferee of Transit Bus Sales, Docket No. 55929; John Walter Goemans Trust, by Christine Goemans, Trustee, "Alleged" Transferee of Transit Bus Sales, Docket No. 55930; John P. Wagner, Transferee of Transit Bus Sales, Docket No. 55931; Jacqueline Gretchen Goemans Trust, by Christine Goemans, Trustee, "Alleged" Transferee of Transit Bus Sales, Docket No. 55932; John P. Wagner, Docket No. 56823; Leo G. Roemer, Docket No. 56837; Edward M. Goemans, Docket No. 56840. Transit Bus Sales is listed in each docket as "a former Wisconsin corporation."↩
*. Transit Bus Sales Co.↩
*. Computed by determining the approximate selling prices of the 48 units sold in fiscal 1946.↩
*. Jan. 31, 1941 to Nov. 30, 1941 ↩
**. Fiscal year ended Nov. 30↩